TEXAS & PACIFIC RAILWAY COMPANY V. MRS. KATHERON BROWN.

No. 8167. Decided March 29, 1944.
(181 S. W., 2d Series, 68.)

*M. E. Clinton,* of Dallas, *Burges, Burges, Scott, Rasberry & Hulse* and *Roy D. Jackson,* all of El Paso, for petitioner.

The Court of Civil Appeals erred in affirming the judgment of the trial court on the ground that the evidence raised the issue of discovered peril and that the action of the court was based on speculation, or by placing one inference upon another, that the employees of the defendant realized the position of plaintiff in time to stop the train. Panhandle & S. F. Ry. Co. v. Napier, 135 Texas 314, 143 S. W. (2d) 754; Texas & Pac. Ry. Co. v. Foster, 58 S. W. (2d) 557; Schumacher v. Missouri Pac. Trans. Co., 116 S. W. (2d) 1136, 1139.

*Robert L. Holliday* and *Harold L. Sims,* of El Paso, for respondent.

The judgment of the Court of Civil Appeals was not based on mere speculation and it was not error for the Court to hold that the issue of discovered peril was raised by the evidence. St. Louis, S. W. Ry. Co. v. Chestnut, 83 S. W. (2d) 1052; Houston & Texas Central Railway Co. v. Dumas, 149 S. W. 543; Trochta v. Missouri, K. & T. R. Ry. Co. 218 S. W. 1038.

MR. JUDGE SLATTON, of the Commission of Appeals delivered the opinion for the Court.

This is an action for damages brought by Mrs. Katheron Brown against the Texas & Pacific Railway Company as a result of a grade crossing accident. A jury trial resulted in a special issue verdict upon which the trial court rendered judgment in favor of Mrs. Brown for the sum of $15,445.00. The Court of Civil Appeals at El Paso affirmed the judgment on the findings of the jury, which submitted the theory of discovered peril. (Opinion not published). The railway company contends that the issue submitting the theory of discovered peril are not raised by the evidence.

The accident occurred at a crossing on Glenwood Drive within a mile and a half of the limits of the City of El Paso. The railway company has two tracks running east and west where Glenwood Drive crosses them running north and south. "Old County Road" runs south of and parallel with the tracks and intersects Glenwood Drive near the railroad crossing. The railroad tracks are slightly higher than the Old County Road and the approaches to the crossing flange out on both sides of Glenwood Drive. The crossing is in a residential district and there is considerable traffic over it. The usual stationary wooden

cross bars are used to warn the public of the crossing. The deceased was driving his car eastward on the Old County Road and at or near Glenwood Drive turned the car to his left and stopped the car at an angle on the west side of the Glenwood Drive about ten or fifteen feet from the south railroad track. The car was stopped at an angle heading northeasterly. At or about this time the passenger train was approaching on the north track from the east. At or about the same time another car on Glenwood Drive approached the crossing from the north, crossed the railroad tracks and passed the Brown car on the east side. After this car passed the Brown car going south, the Brown car started and moved to the east side of Glenwood Drive, continued on over the first railroad track and was struck by the engine of the passenger train going west as the Brown car was attempting to pass over the north track on the Glenwood Drive crossing. The collision occurred on March 17, 1940, on a bright, sunshiny day at 4:15 P. M., Mountain time. Since we are called upon to test the sufficiency of the evidence in law to fix liability, it is necessary for us to quote copiously from the evidence.

The locomotive engineer testified by deposition, which was offered by Mrs. Brown as follows:

The accident happened on the crossing known as Glenwood Drive; that a person in an automobile going from the "Old County Road" would have to go upgrade considerably. The witness saw a car just before the accident approaching the crossing from the north on the engineer's side of the road right after he had whistled for the crossing, the whistling post for the crossing being about one-fourth of a mile east; that the whistle was blasted at the whistling post, two long, one short and a long; that the whistle was not sounded any more until the fireman asked him to sound it. The train was going about thirty miles per hour. The train was about two hundred feet from the crossing at the time the fireman requested him to blow the whistle; that he had not finished sounding the whistle when the fireman requested him to "big hole it." At that time the train was about forty or fifty feet from the crossing, maybe not that far; that he "big holed it" right there (meaning an application of the emergency air brakes). The passenger train consisted of an engine and six coaches; that going to the speed of thirty miles per hour with the train on the occasion it would require about two car lengths or two car lengths and a half to stop the train after the emergency application of the air brakes takes effect. As to how long it required the engineer to blast the whistle after the fireman requested him to do so, the engineer

said "I would say one second." When asked how much per second would a train slow down after the emergency was applied, the engineer testified he could not say, that it was a mathematical problem; that he did not see the Brown car until it was hit by the front of the engine. "After I saw the car roll, and nobody close to the track, I released my air and let the train roll off the crossing. I released the air when I saw the automobile fall in the clear on the north side of the track."

Mrs. Brown offered in evidence the deposition of the fireman, who testified as follows:

At the time of the accident the train was going between twenty-five and thirty miles per hour; that the train consisted of six cars and an engine, equipped with air brakes in good condition. The fireman was familiar with the crossing on Glenwood Drive; there is a whistling post east of the crossing; that he saw a car coming from the north before the train reached the crossing, saw the Brown car before the accident, which was standing still when he first saw it. It was headed northeast at an angle of northeasterly. The Brown car appeared to be on the western side of the crossing. The automobile that came from the north before the accident passed between the Brown automobile and the train; the cars were seen to stop on the north and south sides of the tracks headed toward one another. Then the car from the north side passed on south on the east side of the Brown car. After the car from the north cleared the Brown car moved from that position. When the automobile going south passed around the Brown car, the engineer was requested to blow the whistle, at which time the engine was about two car lengths and the engine from the crossing. The engineer then whistled. "The Brown car had not started up when I asked the engineer to blow the whistle."

"Q. How far did you say the engine was from the track when the automobile started up. How far from the crossing?
"A. Well, it was less than two cars and the engine.
"Q. Two cars, did you say?
"A. No, it wasn't two car lengths; of course I didn't pay much attention then until I was of the opinion he was going in front of us.
"Q. Then what did you do?
"A. I said 'stop, you're going to hit him,' and gave him a sign.
"Q. How far was the engine from the crossing when you told him to kill it or big hole it?
"A. Forty feet.

"Q. You told him to big hole it after you concluded he was going to cross?

"A. Yes, sir.

"Q. How far was the train from the crossing when the Brown car started moving toward the track?

"A. Well, it was between the first time I told him to whistle, it was approximately two cars and the engine and at the time I told him then to stop, that would be hard for me to tell. I wasn't paying much attention to distance. I was watching to determine in my own mind whether he was going over or not. As soon as I did, I said 'stop.'

"Q. How long in seconds since he started moving before you came to that conclusion?

"A. Well, I don't know; that would be hard to determine, for me to say.

"Q. Can you approximate it?

"A. No.

"Q. You knew when he started if he didn't stop again he would cross that track?

"A. If he didn't stop, sure.

"Q. Did you figure that when the other car from the north passed in between you and the Brown car that might prevent him from seeing the approaching train.

"A. Yes, sir, that is why I asked the engineer to blow the whistle.

"Q. Now where did you say the automobile was on the crossing when struck, approximately; give us your best estimate, please.

"A. Well in my opinion, of course it is only a guess, is approximately the middle of the crossing.

"Q. How many seconds would that train go, how many feet in a second would that train go, at the speed it was going, approximately?

"A. About forty-five feet, I suppose, a second.

"Q. When you told the engineer to kill it, did he kill it?

"A. He set the brakes, yes.

"Q. Do you know about how long it would take a train to stop at different speeds when placed in an emergency?

"A. Yes.

"Q. How far, considering your speed and equipment and your passengers, how far should that train have gone after the emergency was placed?

"A. You mean if the emergency feature had been left to take its course through the entire equipment?

"Q. Yes.

"A. It would have stopped in less than a train length.

"Q. After you asked the engineer to kill the engine, if he had used all of the emergency that he had, how soon should the train have stopped?

"A. If he would have left the brakes in emergency, it would have stopped, I guess in four or five car lengths.

"Q. How long does it take that application when put in emergency to take effect, in seconds, one or two?

"A. That is something I can't answer.

"Q. It does not take very long?

"A. Less than seconds.

"Q. I will ask you this, Mr. Woodley, after the emergency had been applied, when you asked him to whistle, that would have reduced the speed of the train to such an extent that the car could have gotten across, wouldn't it, ·because he almost made it?

"A. It could have reduced the speed of the train more than it was, sure.

"Q. If he had put that in emergency when you asked him to kill it and left it, then he would have instantly begun a reduction of the speed of the train?

"A. He did make the application when I asked him.

"Q. Did he put in full emergency?

"A. He did, the brake valve.

"Q. If he had applied each emergency when you asked him to big hole it, couldn't he have stopped that train within forty feet of the crossing, the engine in forty feet instead of going the whole length of the train?

"A. If he had left the brake valve in its emergency feature, the train would have stopped, but the fact he did use the emergency port in the brake valve, there was nothing that could have been done to increase the stopping feature of the train at that time. The only difference is to leave it there. The train would have stopped quicker than it was.

"Q. If you had asked him to kill it when you told him to whistle, the accident would not have happened?

"A. Not that I know of. We would have gone over the crossing before we stopped.

"Q. The speed· would have been so reduced the automobile would have gotten across?

"A. It would have been reduced, sure.

"Q. He would in all probability have gotten across.

"A. I suppose so."

Mrs. Brown offered in evidence a part of the deposition of Mrs. Gildersleeve, as follows:

"I was sitting in a car; it was parked a short distance from the railroad crossing. I was within a quarter of a block from the accident. I heard it (the train) blowing the whistle before it came in sight. Well, I could not see the train when I first heard the whistle, but I know that part of the country and I just imagined it was whistling for a crossing farther down. The train whistled again as it neared the crossing in question and then whistled a third time as Mr. Brown's car approached the track. Well, the third whistle, or the one referred to in the former question was the whistle just as Mr. Brown's car reached the crossing. Yes, I saw the automobile approaching the crossing; I saw him make a left turn to go up to the crossing. Yes, the car stopped and another car coming from the opposite direction crossed the railroad tracks and was forced by the position that the Brown car was in to pass him on the wrong side of the road and the car naturally went between Mr. Brown's car and the train. The train was in view and approaching the crossing at the time the deceased stopped his car. The train was just coming in view when Mr. Brown stopped his car, which I believe would be more or less a block or a block and a half away. The front of the engine on the train had just approached the crossing when Mr. Brown's car started moving forward. Well, after the train was approaching when I first saw it come into view, as far as I can remember Mr. Brown's car was already stopped near the tracks and as the train came on Mr. Brown's car was parked in a rather odd position. It was on an angle and it would have been natural that in the position his car was sitting for him to have moved it up in order that another car might pass and he pulled the car up towards the right hand side of the road and the train was coming on and in place of stopping when he got his car straightened out on the right hand side of the road, he kept right on across the tracks and the train came on. The car was hit about the center and knocked off on the right hand side of the tracks. After the train hit the car I could not see it any more because it had gone over an embankment.

"Q. Isn't it a fact that the Brown car was standing south of the railroad crossing and immediately after the automobile coming from the north passed over the track, started in a northerly direction across the track and about that time the train gave an extra long blast of the whistle?

"A. As I said before, Mr. Brown's car was sitting on an angle across the Glenwood Drive and the car that approached from a northerly direction was forced to pass him on the wrong side

and it was after the car had passed him that he started his car up towards the tracks. Yes, the train did give long blasts of the whistle about that time.

"Q. Isn't it a fact that just about the time the Brown car started across the tracks that the whistle on the engine began blowing and continued until long after it had struck and knocked the Brown car off the tracks?

"A. Well, I can't say how long the whistle blew. It was quite a shock to see the car hit and I couldn't remember how many blasts there were after the car was hit."

The evidence shows that the locomotive engineer could not see the Brown car as the west bound train approached the crossing on the north tract until the Brown car was on the crossing in front of the oncoming engine. The engineer testified that he did not see the deceased's automobile until the collision occurred. It appears without dispute that the Brown car was stopped on the west side of Glenwood Drive and within ten to fifteen feet of the south track when the train was within two hundred feet of the crossing, running at a rate of speed of thirty miles per hour toward the crossing. According to the fireman, the engineer was requested to blow the whistle, which he did. Thereafter the Brown car started and moved from the west side of Glenwood Drive and, as the fireman put it, "as soon as he could determine in his own mind that the Brown car was going on the crossing in front of the engine, he requested the engineer to big hole it (or meaning to apply the emergency air brakes) which the engineer did." According to the testimony of both the engineer and the fireman, at that time the engine was within forty feet of the crossing.

The respondent contends that under the facts and circumstances in evidence, at the time the fireman requested the engineer to blow the whistle, the deceased was in a position of peril, and had the fireman at that time requested the engineer to stop the train or reduce the speed, the accident would not have occurred. If the Brown car was stopped at the time, as the fireman positively testified, of course the deceased was not in a position of peril. But the respondent contends that the jury had a right to disbelieve this portion of the fireman's testimony and that the evidence of the engineer and Mrs. Gildersleeve, together with other facts in evidence, are susceptible of the construction that at the time the fireman requested the engineer to blow the whistle the Brown car had theretofore started toward the crossing and was in a position of peril. We do not think the evidence is fairly susceptible of that construction. It may be

conceded that the evidence is susceptible of the construction that the Brown car started its movement before the whistle was sounded and heard by Mrs. Gildersleeve, but this is not sufficient to place the deceased in a perilous position under the facts and circumstances in evidence. It requires some time for the fireman to request the engineer to sound the whistle and for the engineer to duly execute the request and for the sound of the whistle to reach the hearing of Mrs. Gildersleeve a block away. According to the engineer and the fireman the train was within two hundred feet of the crossing when the fireman commanded the whistle to be blasted. At that time the train was traveling about thirty miles per hour, or about forty-four feet per second. The Brown car was stopped within ten to twenty feet from the south track. The automobile passed over the crossing from the north and passed the Brown car on the east side, i. e., between the Brown car and the oncoming train when the fireman ordered the engineer to blow the whistle, which was done. After the fireman requested the engineer to sound the whistle, the Brown car started and as soon as the fireman decided in his own mind that it was the intention of the driver of the Brown car to cross the track in front of the train, the fireman requested the engineer to "big hole it," or apply the emergency. According to both the engineer and the fireman the engine was about forty feet from the crossing at that time. We recognize the rule that a jury may accept or reject portions of the testimony of a witness, Austin Fire Ins. Co. v. Adams-Childers Co., 246 S. W. 365; still, there must be other facts and circumstances, or the testimony of other witnesses in evidence, to supply that which has been rejected when the question to be determined is whether the case made is one which in law is sufficient to fix liability.

■ In order to fix liability in this case it must appear from the facts and circumstances in evidence that the fireman (although admittedly having seen the Brown car stopped near the south track as the train was approaching the crossing) should have known by the exercise of ordinary care that the Brown car was about to attempt to drive upon the crossing in front of the oncoming train and that there remained sufficient time for the operatives of the train to avert the collision by the use of all the means at hand consistent with their own safety and the safety of the passengers on the train. The engineer and fireman gave the only testimony with respect to the time and distance required to stop a train consisting of an engine and six passenger coaches under the circumstances existing at the time of this accident. From their testimony it would seem that a train

such as the one involved in this accident, traveling at a speed of thirty miles per hour, would require a distance of some two hundred feet from the time the emergency brakes were applied and became effective to come to a stop. It appears from the testimony of the engineer and the fireman that it requires about one second to make the emergency brake application and from one to two seconds for the emergency application to become effective. Therefore, it is apparent that when the positive testimony of the fireman with respect to the Brown car being stopped at the time he requested the engineer to whistle is discredited or disbelieved and not considered, no other facts or circumstances appear in evidence which would authorize a court or jury to infer that the Brown car had started across the tracks at that time, thus placing the deceased in a position of peril. It is too speculative to say when the Brown car started toward the south track from its stopped position that the operatives of the passenger train knew or should have known by the exercise of ordinary care that the Brown car was going to continue across the north track in front of the oncoming train. Particularly is this true where the evidence does not show the speed of the Brown car as it approached the north tracks from its stopped position. In so far as liability is concerned, the operatives of the train cannot be said to be guilty of negligence until it was known or should have been known by the exercise of ordinary care that the Brown car was going to cross the north track in front of the oncoming train (thus placing the deceased in a position of peril) and at that time it was possible for the operatives of the train, by use of all the means at their command consistent with their own safety and the safety of the passengers, to have averted the collision and failed to do so.

■ The extent of the reduction in speed the application of the emergency has upon a train like the one involved in this accident does not appear in the evidence, other than the distance required to stop when the train is going thirty miles per hour. It would require some two hundred feet for the train to stop. In order to hold liability under the evidence in this case it would be necessary for us to place one inference upon another. While it is true that an inference may be drawn from facts proved, an inference cannot be drawn from another inference. Wells v. Tex. Pac. Coal & Oil Co. et al, 164 S. W. (2d) 660.

Let us infer that at the time the fireman requested the engineer to whistle (which we cannot do under the facts in evidence) that the Brown car had started toward the south tracks. Would it be permissible in law to further infer that the deceased

was intending to continue his movement across the south tracks and on across the north tracks in front of the oncoming train?

■ In order to place the deceased in a position of peril such an inference must be indulged. This the law will not permit. The Brown car was stopped on the west side of Glenwood drive at a northeasterly angle and the evidence is without dispute that the Brown car traveled from its stopped position on the west side of Glenwood Drive northeasterly to the east side of Glenwood Drive before it attempted to cross over the tracks where the collision occurred. Under these facts and circumstances, where the oncoming train was, when it could have been known or should have been known by the exercise of ordinary care that the deceased was in a perilous position, and whether the operatives of the train could have averted the collision by the exercise of ordinary care, and failed to do so, cannot be determined without indulging in sheer speculation. This the law will not permit. The burden of fixing liability against the railroad company was upon Mrs. Katheron Brown. We think she failed to acquit herself of this burden. We therefore hold that the evidence is not sufficient in law to raise the issue of discovered peril. Fort Worth & Denver City Ry. Co. v. Shetter, 94 Texas. 196, 59 S. W. 533; Galveston H. & S. A. Ry. Co. v. Price (Com. App.), 240 S. W. 524; T. & P. Ry. Co. v. Breadow, 90 Texas 26, 36 S. W. 410; Texas & N. O. Ry. Co. v. Adams, 27 S. W. (2d) 331; Young v. Dallas Railway & Terminal Co., 136 S. W. (2d) 915; T. & P. Ry. Co. v. Foster, 58 S. W. (2d) 557. We have carefully considered the cases cited by the respondent, as well as other cases to which we have access and find that none of them support the contention of the respondent.

It is necessary for us to determine whether the judgment of the Court of Civil Appeals in favor of the respondent can be properly sustained on any other theory.

The honorable Court of Civil Appeals properly held that when the evidence and the findings of the jury are in favor of the complaining party upon the theory of discovered peril the issues of primary and contributory negligence become immaterial. Wilson v. Southern Traction Co., 111 Texas 361, 234 S. W. 663. The court having entertained the view that the evidence in this case raised the issues on the theory of discovered peril, did not pass upon other attacks made by the railroad company in the Court of Civil Appeals upon other findings of the jury. In addition to the findings on the theory of discovered peril the jury found in effect that the operatives of the train "failed to blow the whistle continuously for the Glenwood Drive

crossing from the whistling post until the crossing was approached" that such failure was negligence and proximate cause. The petitioner contended in the Court of Civil Appeals and makes the same contention in this Court that no issue of negligence was raised in the failure of the operatives of the train to blow the whistle continuously from the whistling post until the crossing was approached under the facts in this case, in that the crossing was not shown to be obstructed to view or an extra hazardous one. The operatives of the train were not required to blow the whistle continuously from the whistling post until the train had passed over the crossing under Vernon's Annotated Civil Statutes, Art. 6371. Houston & T. C. Ry. Co. v. O'Neal, 91 Texas 671, 47 S. W. 95. Conditions of a crossing may be such as to require the giving of additional warning than is required by statute but the facts in this case do not bring it within those cases. See Missouri K. & T. v. Oslin, 63 S. W. 1039 (wr. ref.); G. H. & S. A. Ry. Co. v. Wells, 121 Texas 310, 50 S W. (2d) 247. According to the proof the crossing where the accident occurred in this case is unobstructed and was not shown to be an extra hazardous one. There is no support in the evidence for the finding of the jury that the operatives of the train were negligent in failing to blow the whistle from the whistling post continuously until the crossing was approached. The evidence being insufficient to raise the issues of discovered peril and to support the only finding of primary negligence, there is no basis for the judgment rendered by the trial court and the Court of Civil Appeals against the railway company.

The judgments of the lower courts are reversed. The cause will be remanded to the trial court. Texas Employers Ins. Ass'n. v. Herring, 280 S. W. 740.

It is so ordered.

Opinion adopted by the Supreme Court March 29, 1944.