TEXAS & N. O. R. CO.

v.

FOSTER.

No. 4870.

Court of Civil Appeals of Texas.

Beaumont.

March 4, 1954.

Rehearing Denied March 24, 1954.

Woodul, Arterbury & Wren, Baker, Botts, Andrews & Parrish, Houston, J. E. Faulkner, Cold Springs, for appellant.

Helm & Jones, Houston, H. S. Lilley, Cold Springs, Alvis S. Ellisor, Cleveland, for appellee.

ANDERSON, Justice.

This suit was brought by the appellee, H. R. Foster, to recover damages for personal injuries sustained by him when, at 5:37 p. m. on May 8, 1951, an automobile which he was driving in a westerly direction along Sixth Street in the town of Shepherd, Texas, was struck by the steam locomotive of one of appellant's regularly scheduled, south-bound passenger trains. Upon a jury's verdict, judgment was rendered in favor of appellee for the sum of $30,000.

The jury, in response to special issues, found, in substance, that the operatives of appellant's locomotive were guilty of negligence (1) in failing to keep a proper lookout, (2) in failing to ring the bell and to keep it ringing continuously while the locomotive was in motion for a distance of 80 rods from the crossing, (3) in failing to sound the locomotive's whistle at a distance of 80 rods from the crossing, (4) in failing to sound the whistle or the bell immediately before the collision, (5) in failing properly to apply the brakes, and (6) in failing to have the locomotive under proper control as it approached the crossing. Each act of negligence so found was also found to have been a proximate cause of the collision. In addition, all issues submitted under the doctrine of discovered peril were answered favorably to the plaintiff. All issues submitting the defendant's defensive theories were answered against the defendant, and the collision was found not to have been the result of an unavoidable accident.

The appellant predicates its appeal upon seven points of alleged error. The first three urge that the evidence showed the appellee to have been guilty, as a matter of law, of contributory negligence which prox-

imately caused his injuries. The fourth urges that there was no evidence to justify submission to the jury of issues under the doctrine of discovered peril. The fifth complains of the failure of the trial court to grant the defendant a new trial because of side-bar remarks made by counsel for the plaintiff during the progress of the trial. The sixth urges that the damages awarded the plaintiff are so grossly excessive as to indicate bias and prejudice on the part of the jury. And the seventh urges that the appellee failed to establish by a preponderance of the evidence any negligence upon the part of appellant, and that therefore the trial court should have instructed a verdict in favor of appellant.

 We have concluded, for reasons to be hereafter stated, that appellant's fourth point is not well taken and that the evidence not only required submission of the issues under the doctrine of discovered peril but was sufficient to support the jury's findings on those issues. Appellant's fourth and seventh points are accordingly overruled. And since the foregoing conclusion renders it unnecessary that we pass upon appellant's first three points, we forego doing so and pretermit any discussion of them. Wilson v. Southern Traction Co., 111 Tex. 361, 234 S.W. 663; Texas & P. R. Co. v. Brown, 142 Tex. 385, 181 S.W.2d 68.

Sixth Street in Shepherd crosses appellant's railroad at almost right angles. The general course of the railroad is north and south, while that of the street is east and west. The crossing is approximately 700 feet north of the railroad depot; and is approximately 1485 feet south of the south point of a curve in the railroad track. The crest of the bed of the railroad track is some four feet higher that the basic level of the street, and the incline in the street between the two levels is some forty feet in length on the east side of the track. On the date appellee was injured section houses, telegraph poles, some stacked fence posts, and a garden which was enclosed by a wire fence were situated within appellant's right-of-way, north of Sixth Street and east of the railroad track. The section houses were in line and their fronts were 37½ feet from the track. The most southerly of the houses was 212½ feet north of the street. The garden was between this most southerly of the houses and the street. The telegraph poles appear to have been a little further from the track than were the fronts of the houses, and the stacks of fence post, which were also south of the most southerly of the houses, do not appear to have been much higher than the porch floors of the houses. Trees stood north of the houses. The standard wooden railroad marker stood east of the track. There were no crossing lights, barriers or other similar devices at the crossing.

The appellee was thoroughly familiar with the crossing, and knew that a passenger train passed through Shepherd late each evening. He operated a garage that stood only 275 feet east of the railroad track, on the south side of Sixth Street. He had just left his garage and had proceeded only the short distance to the track when the collision occurred. He was accompanied by Troy Wiggins, who rode beside him. The car he was driving was owned by Wiggins. Appellee had installed a transmission in it earlier during the day, and he and Wiggins had started out to see if the transmission was working properly. It appears that Wiggins had his head beneath the dash of the car, apparently listening for any untoward sound in the transmission, as the car approached and went upon the railroad track. The automobile, judging from pictures of it that appear in the record, must have been fairly well centered on the track at the moment of impact. It became fastened on the front end of the locomotive and was carried, with appellee and Wiggins in it, a distance of 713 feet, the distance at which the locomotive was brought to a stop. The automobile was virtually demolished, Wiggins was killed, and appellee was injured.

The appellee testified that as he approached the track, and at a distance of approximately forty feet from it, he stopped the automobile and looked first to his left and then to his right for approaching trains. Having (according to his further testimony).

neither seen nor heard a train in either direction, he then started the automobile forward in low gear and, without again looking in either direction for a train until virtually the moment of impact, gradually increased the automobile's speed until he shifted into second gear just as he "hit the track." He estimated that the automobile had attained a speed of between five and ten miles per hour, probably eight to ten, by the time it reached the track. He was of the opinion that at any time before it reached the track he could have stopped it within six or eight feet, and said that if he had seen the train when he was twenty feet from the crossing, the collision would not have occurred. He offered no explanation for his failure to look again for an approaching train after (as he testified) he started his car from a standing position.

The appellee testified that from where (as he claimed) he stopped the automobile east of the railroad track he could see along the track toward the north for only a distance of approximately 300 feet, or about 100 feet beyond the nearest section house. The appellant, on the other hand, introduced testimony to show that when standing in the middle of Sixth Street, forty feet east of the center-line of the railroad track, a person could see along the track toward the north a distance of 1485 feet, and that when standing within twenty feet of the center-line of the track such person could see along the track for a distance of a half mile.

The appellee testified that the locomotive's whistle was not blown and that its bell was not rung as the train approached the crossing. He said there was nothing wrong with his sense of hearing, and that from his position in the automobile he could have heard either the whistle or the bell if either of them had been sounded.

As further tending to establish that the whistle was not blown and the bell was not rung, appellee also introduced the testimony of the witnesses Paul Anderson, R. E. Hamm, Jack McAdams, and T. A. Bice, each of whom by his testimony placed himself in close proximity to the crossing at the time of the collision: Anderson was in his garden, just a short distance east of the crossing; Hamm was in his yard, just west of the railroad, between the depot and the crossing; McAdams was walking along Sixth Street toward the crossing, only a very short distance behind the automobile involved; and Bice was in appellee's garage. Each of these witnesses testified that he did not hear either the locomotive's whistle or bell, or even the train itself, at any time before the collision, but that he did hear the sound of the collision. McAdams testified, in addition, that he saw the collision occur; and Hamm, that he saw the locomotive pushing the automobile along the track. McAdams also testified that before the collision he saw the automobile stop about forty feet east of the track.

Both the engineer and the fireman on the locomotive involved were long experienced in their jobs, had operated locomotives over the same railroad for many years, and were familiar with the crossing at which the collision occurred. On the day of the collision they were preparing to stop the train at the depot, Shepherd being a regularly scheduled stop. They both testified that up until the emergency arose they had in all respects handled the train upon this occasion as they customarily handled it in approaching the station and the street crossing, and had done and were doing the things they customarily did in making those approachments. Both testified that at the station-board a mile north of the depot the engineer blew the whistle for the station; that a light or service application of the brakes was made after the train rounded the curve north of the crossing; that the whistle was blown for the crossing at which the collision occurred; and that the bell was ringing as the train approached the crossing and was kept ringing until after the collision. They were agreed that the regular crossing signal—two long blasts, a short blast, and another long blast—was blown for the crossing.

The engineer testified that he blew the crossing signal at the whistle-board, the "regular, qualified distance" from the crossing. He estimated the whistle-board to be between 300 and 500 feet from the crossing.

211

He testified that the fireman turned the bell on about when the locomotive was at the whistle-board. The fireman himself testified that he turned the bell on just after the engineer had finished blowing for the station. He had earlier testified by deposition that he turned it on "right close to a quarter of a mile back there before approaching the crossing." Both the engineer and the fireman estimated that before the initial service application of the brakes, the train had been traveling at a speed of fifty miles per hour. The engineer estimated the train's speed thereafter at from 35 to 40 miles per hour; the fireman, at about 40 miles per hour.

The fireman, G. L. Moore, who occupied the side of the locomotive that was toward appellee as the latter approached the track, estimated that when he first saw the automobile the locomotive was within 175 feet of the crossing. The automobile, according to his testimony on direct examination, was then an estimated distance of thirty feet from the track. While being cross-examined, he estimated this distance at forty feet. He said the automobile was in motion when he first saw it, and that it continued to move steadily toward the track, without pause or diminution of speed. He estimated the automobile's rate of speed at "around fifteen miles per hour", but said it might have been less. He said he realized the automobile was in danger if neither it nor the train stopped, but that because of his expectation that the automobile would stop, he did not, when he first saw it, apprise the engineer of its approach or call upon the engineer to do anything. His testimony was that the automobile was running so slowly it could have been stopped at almost any time, and that until too late he assumed it would be stopped. He saw the shirted back of the person on the right hand side of the automobile and that such person (Wiggins) apparently had his head down; but he did not see this, he said, when the locomotive was 175 feet from the crossing, but only after he got close enough to see well into the automobile. He said that when it occurred to him that the automobile was not going to stop, the automobile was "right

up on" the track, and the locomotive was within approximately 75 feet of the crossing. The train, he estimated, was then running "close to forty miles per hour." The fireman further testified that immediately upon realizing that the automobile was not going to stop, he hollered to the engineer to "big hole it," by which it was understood that the engineer was to make an emergency application of the train's brakes. He said that when he hollered to the engineer, the latter had his hand on the whistle cord and was blowing the whistle, but immediately dropped his hand from the whistle cord to the brake lever and pushed the latter into emergency position. The fireman maintained that at the time he hollered to the engineer, the latter had already once blown a full crossing signal for the crossing, and was blowing a second time.

When testifying by deposition the fireman appears to have testified both that the automobile was twenty feet from the track and that the locomotive was within approximately twenty feet of the crossing when he hollered to the engineer to stop the train. If this testimony was given through inadvertence, of which there is no clear showing, the intent of the witness is not made altogether clear by the record.

The engineer, R. G. Boatman, who occupied the side of the locomotive's cab that was furtherest from appellee as the latter approached the track, did not see the automobile before the collision. At the moment of impact he saw "gravel and dirt fly," but could not even then, he said, see the automobile. Insofar as the record discloses, the first intimation he had that an untoward or unusual situation existed or might possibly develop at the crossing was when the fireman hollered for him to "big hole it."

The engineer testified that immediately upon hearing the fireman holler, he himself turned loose of the whistle cord, took hold of the brake valve, and placed the latter in emergency position. He said that an emergency application of the brakes followed, but that due to the fact that after rounding the curve he had drawn off some air in making the initial service application of

the brakes, the emergency application did not result as quickly as would otherwise have been the case. It seems that a full service application first resulted, and that it was then necessary for the air pressure to rebuild somewhat before the highest effectiveness of the brakes was obtained. The train stopped only some 150 to 300 feet short of where it would have stopped under normal conditions.

Just what the engineer intended to testify with reference to at what stage of the sequence of events he received the fireman's signal, placed the brake valve in emergency position, and the emergency application of the brakes became fully effective is not altogether clear. Various items of his testimony bear on the questions, but the following are all that appear to have been specifically directed to them:

### Direct Examination:

"Q. When did you see that gravel and dirt with reference to the time you realized what was happening and made the application of your brakes? A. About the same time.

"Q. Then it is your testimony that the brakes went into emergency just about the time the train came into contact with the automobile? A. Right near the time. Of course, I could not tell you whether it was right at the time or a little bit before."

### Cross Examination:

"Q. When you got down fairly close to the crossing, I believe you testified maybe twenty feet from the crossing, the engineer hollered at you, is that right, the fireman hollered at you, you don't remember just what he said, but you thought he said: 'Hold it'? A. He hollered something, and I think that was it.

"Q. Of course, all this time, you had your hand on the whistle cord? A. What time?

"Q. From the curve to the crossing? A. Oh, no.

"Q. Didn't you testify just a minute ago when he told you that, you had to turn the whistle cord loose and grab the brake valve? A. Yes, sir.

"Q. How far before you got to the crossing? A. *Along there, just about the section house.*

"Q. You was blowing the whistle by the section house, and a short distance from the crossing you still had your hand on the whistle cord? A. Which section house are you talking about?

"Q. Just east of the crossing, using your term, you had your hand on the whistle cord? A. No, I just started to blow the whistle.

"Q. Did it take you from the section house until you got within twenty feet of the crossing to start blowing? A. No, the section houses are scattered all along there.

"Q. Where did you start blowing? A. Just before I got to the crossing.

"Q. You didn't blow your whistle before—A. Back at the whistle post and was blowing it again when the fireman hollered to me.

\*　\*　\*　\*　\*　\*

"Q. That's [whistle board] where you start blowing your whistle. You were just fixing to blow the whistle for the crossing when the fireman hollered? A. I was blowing it."

Regarding his customary method of handling the train as it approached Shepherd, and preparatory to stopping it at the depot, the engineer testified: "Usually about the curve east [north] of Shepherd, make a light application of the air, then along after it passes the section houses, I make heavy reduction of the air and with the incline the front of the depot was usually roll up and stop just about right. Sometimes you have to release them, and sometimes you have to give a little more. Just according to how your brakes are holding."

He testified that upon this particular occasion he had, as usual, made a light ap-

plication of the air after rounding the curve, but he did not testify that he had made a "heavy reduction of the air" before the fireman hollered at him. He estimated that at the time the fireman hollered, the train was still running at a speed of from 35 to 40 miles per hour.

Both the engineer and the fireman testified that nothing that would have been effective was left undone by the engineer in his effort to slow and stop the train before it struck the automobile, and that in the circumstances the train was stopped as quickly as could have been expected. Charles E. Francis, another of appellant's employees, who was called by appellant as an expert witness, gave similar testimony, and also testified as to what he termed the "reaction time" necessary for the fireman and engineer to act and for the brakes to take effect. He expressed the opinion that a minimum of four seconds elapsed between the time the fireman concluded to call for an emergency application of the brakes and the time the brakes became fully effective. He also expressed the opinion that the emergency application of the brakes, made after a service application had been made, did not reduce the speed of the train much, if any, in a distance of 175 feet, and that even after the brakes became fully effective in emergency application, the train, which consisted of the locomotive and five coaches, necessarily traveled considerably more than 175 feet before coming to a stop.

In addition to the engineer and fireman, five other of appellant's witnesses, J. E. Tribe, J. W. Carlisle, Willie Kemp, L. C. Taylor, and Calvin Edwards, four of whom, J. W. Carlisle, J. E. Tribe, Willie Kemp, and L. C. Taylor, were employees of appellant, testified that the whistle was blown before the train reached the crossing. None of these, however, testified to having heard the bell ring. Some said they did not hear the bell, while others merely said they did not recall whether they did or not.

The witness Tribe, who was appellant's station agent at Shepherd, testified that he was in his yard just a short distance south of the station whistle-board when the train passed. He said one long blast of the whistle was usually sounded for the station, and that the whistle was blowing as the train passed his house. He paid no more attention, he said, until he heard some short blasts of the whistle which he supposed at the time were being sounded for cattle or horses. He then heard a noise which at the time he assumed was a load of logs being unloaded from a truck.

The witness Carlisle testified that at the time of the collision he and his wife were in their yard about three blocks southwest of the crossing. He said he heard the whistle sounded for both the station and the crossing. He estimated that the train was from a half to three-fourths of a mile away when the station signal was blown. He said the regular crossing signal was blown, but that he could not swear just how many times the whistle was blown in all; said he heard "a lot of whistles." He also testified that he knew the train was due about that time, and that when the whistle blew, he looked up and knew it was the passenger train, and "about that time the collision happened." He said that both he and his wife saw the dust fly. The witness said he did not hear the locomotive's bell ringing. His wife did not testify.

The witness Kemp, a section hand who lived in the section house nearest Sixth Street, testified that he heard the train as it passed his house. He said he first heard the whistle when the train was near the water tank, which he estimated to be about a mile and a half north of Shepherd, and that he next heard it when the train was "right around that curve." He testified also that he heard some short blasts of the whistle when the train was near his house, but that he did not know just where the train was at that time. He said these were loud and short, as if something was in the train's way. He testified that he couldn't say he heard the bell, and didn't know whether it was ringing or not.

The witness Edwards, another section hand, testified that when the train passed he was in the garden between Sixth Street and the most southerly of the section houses. He said he heard the whistle when

the train was about at the mile board, and then heard it again, but that he could not say how near the train was to the crossing when he heard it the second time. He said he did not know whether or not the bell was ringing. He was at the garden gate when the train actually passed by. Just previously, he had been talking to L. C. Taylor, who was on the opposite side of the track.

The witness Taylor said he was sitting in a box car about 75 feet north of Sixth Street when the train passed. He was engaged in conversation with Calvin Edwards as the train approached. He said he first heard the whistle just before the train got to where the section boys leave to go to work, and that as the train then came on toward the crossing the whistle was blowing steadily and was still blowing when the train passed by him. He said he did not hear the bell ring.

■ The evidence made an issue of fact, we think, as to whether or not the whistle was blown and the bell was rung as the train approached the crossing. This is particularly true with reference to whether or not the whistle was blown and the bell was rung immediately before the collision. The testimony that they did not hear the whistle or bell, given by witnesses who were so situated as to render it reasonably probable that they would have heard them in the existing circumstances if they had been sounded, while negative in its nature, was evidence which is recognized as having probative value to establish that the whistle and bell were not sounded. And since it was evidence having probative value, the weight to be given it was, in our opinion, a matter for the jury to determine. See: Paris & G. N. R. Co. v. Lackey, Tex. Civ.App., 171 S.W. 540; Texas & N. O. R. Co. v. Krasoff, 144 Tex. 436, 191 S.W.2d 1; American Asphalt Co. v. O'Rear, Tex. Civ.App., 36 S.W.2d 779; Chicago, R. I. & G. R. Co. v. Johnson, Tex.Civ.App., 224 S.W. 277; Dixon v. Texas & P. R. Co., Tex.Civ.App., 164 S.W.2d 252, 253; Texas Employers' Ins. Ass'n v. Locke, Tex.Civ. App., 224 S.W.2d 755.

■ The appellant urges that even though the evidence just referred to was some evidence of the facts sought to be proved, the jury's findings thereon were so against the greater weight and preponderance of the evidence as to be clearly wrong, and should therefore be either set aside or disregarded. It must be borne in mind, however, that all except one of the witnesses who testified for appellant that the whistle was blown and the bell was rung were employees of appellant; that there were discrepancies in their testimony as to the manner in which and the times and places at which the whistle was blown; that the jurors were the judges of the credibility of the witnesses; and that the evidence must be construed in the light most favorable to the jury's verdict. These things considered, we feel that, regardless of the conclusions we might have reached as original fact finders, the findings of the jury must be permitted to stand.

■ But irrespective of the correctness of the findings just mentioned, the jury was unquestionably justified in concluding from the evidence that the whistle was not blown between the time at which the fireman realized appellee's peril and apprised the engineer of the emergency, and the time at which the collision occurred. Neither the engineer nor the fireman testified that the whistle was blown during that interim, and the only reasonable inference to be drawn from their testimony is that it was not blown.

■ It is, of course, the appellant's theory of the case that appellee's perilous position was discovered and realized too late for the whistle to have been thereafter-wards instrumental in averting the collision: a theory which would be rather strongly supported if we should accept as true the testimony of the fireman to the effect that at the time he realized appellee's peril, the automobile was virtually upon the track, and the locomotive was within seventy-five feet of the crossing; and the engineer's testimony that at the time he received the fireman's warning, the loco-

motive was within approximately twenty feet of the crossing. But the jury was not bound to accept this testimony as true. Ford v. Panhandle & S. F. Ry. Co., Tex. Sup., 252 S.W.2d 561, and the cases therein cited. And there was ample evidence to justify it in concluding that both when the fireman first realized that the automobile was either in, or about to enter a position of peril, and when he warned the engineer of the emergency, the automobile still lacked several feet of being to the track, and the locomotive was considerably more than twenty or even seventy-five feet from the crossing.

The section house nearest the crossing was 212½ feet from it; and the engineer himself testified in one instance that at the time he received the fireman's warning, and himself dropped his hand from the whistle cord to the brake valve, the train was "along there, just about the section house." His testimony in this respect was to some extent corroborated by the fact that, while it was his custom to make a heavy reduction of the air "along after" passing the section houses, he had on this occasion made no such heavy reduction of the air before receiving the fireman's warning. It is still further corroborated by the fact that if (as the jury was at liberty to conclude from the engineer's testimony) the brakes became effective in emergency at about the time of or just before the collision, and if (as appellant introduced evidence to show) four seconds elapsed between the fireman's warning and the emergency effectiveness of the brakes, and during that four seconds the train was running at a speed of forty miles per hour, the train would have been approximately 235 feet from the crossing at the time the warning was given. Furthermore, the fireman testified that immediately upon realizing that the automobile was in peril, he hollered to the engineer. The fireman saw the automobile when it was 30 or 40 feet from the track, or about four seconds distant, when reckoned in time. And the fact that it was then, according to appellee's testimony, being accelerated toward the track is a circumstance which,

if it is not alone sufficient to support, nevertheless tends strongly to support the inference that immediately upon discovering it, the fireman realized that the automobile was in or was about to enter a position of peril. Missouri, K. & T. R. Co. of Texas V. Reynolds, 103 Tex. 31, 122 S.W. 531.

After discovering and realizing that the automobile was in or was about to enter a position of peril, the operatives of appellant's train were under the duty of exercising reasonable care in the use of all means at their command, consistent with their own safety and that of the train and its passengers, to avoid the ensuing collision. A proper discharge of that duty required that, in addition to or in lieu of their efforts to slow and stop the train, they give an alarm by whistle or bell or by both (so that appellee might have an opportunity to extricate himself from his perilous position) if in the exercise of reasonable care in the circumstances a person of ordinary prudence would have given such alarm. Texas & N. O. R. Co. v. Krasoff, 144 Tex. 436, 191 S.W.2d 1; Houston & T. C. R. Co. v. Stevenson, Tex. Com.App., 29 S.W.2d 995; Missouri, K. & T. Ry. Co. v. Reynolds, 103 Tex. 31, 122 S.W. 531.

The jury found that no alarm was given by either whistle or bell, and the appellant did not even contend that the whistle was blown, after appellee's position of peril was discovered and realized by the fireman. We are not at liberty under the evidence to say that as a matter of law neither the blowing of the whistle nor the ringing of the bell would have been effective in the circumstances to enable appellee to extricate himself from his position of peril, by either stopping the automobile or turning it aside before going upon the track. And since, alternatively or in combination, there was available to the train operatives more than one means by which they might have averted the collision, the question of whether or not in making use of those means, and in employing such of them as they did, to the exclusion of oth-

ers, the operatives exercised that degree of care which persons of ordinary prudence would have exercised in the circumstances was clearly a matter for the jury's determination. Missouri, K. & T. R. Co. v. Reynolds, supra, 122 S.W. 531.

Under its fifth point, which assigns error to the failure of the trial court to grant its motion for a new trial, the appellant has directed our attention to some thirty-one separate instances in which it contends one of appellee's attorneys was guilty of making improper and prejudicial side-bar remarks during the progress of the trial. The appellant, in effect, concedes that no one of these incidents, standing alone, constituted reversible error; but argues that the collective effect of the various incidents was so prejudicial as to have entitled it to a new trial and as now to require reversal of the trial court's judgment.

Only a few of the matters now complained of were objected to at the time they occurred. The rest of them, if they were complained of at all in the trial court, were complained of for the first time in appellant's motion for a new trial. The motion for new trial did not collate the matters complained of nor did it direct the trial court's attention to them with more particularity than by the generalization, "said remarks having been made in the presence of the jury and over the timely objection of counsel for the defendant, all as shown by the statement of facts." Such objections as defense counsel made during the trial to the remarks and conduct of appellee's attorney were invariably sustained by the trial court, and the jury was instructed to disregard the remarks toward which such objections were directed. In addition, the court, in the presence of the jury, at different times admonished counsel to refrain from making side-bar remarks. No motion for a mistrial because of the matters now complained of was made at any stage of the proceedings.

It would be impractical, in that it would lengthen this opinion out of all proportion to the worth of any purpose to be served, for us to attempt to detail and discuss separately each incident of alleged misconduct on the part of appellee's counsel to which in its brief the appellant has directed attention. We have, however, carefully examined and considered each of them in the light of the circumstances attending it, and have considered all of them in the light of the record as a whole. Some of the matters we do not consider to have been improper in the circumstances. Others of them were clearly improper, but we are of the opinion that none of these was of a nature that its prejudicial effects, if any, could not have been offset by a proper instruction from the court to disregard the remark, question, or conduct. As regards such of them, therefore, as were not objected to at the time they occurred or as were not complained of in some other appropriate manner before the conclusion of the trial, the appellant has waived its right to complain. Appropriate instructions having been given in those instances where objection or motion was timely made by defense counsel, such errors as may have been involved in those instances were, we think, cured. In view of the curative measures taken, we do not feel that the cumulative effect of the various incidents to which appellant made objections, even when considered in connection with the incidents to which no objections were interposed, was so prejudicial to appellant's rights, the record as a whole considered, as to constitute reversible error. Control of the conduct of counsel during a trial must necessarily rest within the sound discretion of the trial court, and we are not prepared in this instance to say the trial court abused its discretion in refusing to grant appellant's motion for a new trial. See: Rule 269(f), Texas Rules of Civil Procedure; Airline Motor Coaches v. Campbell, Tex.Civ.App., 184 S.W.2d 532; 64 C.J. 233, § 248. Appellant's fifth point is accordingly overruled.

Under its sixth point appellant argues that the sum of $30,000 awarded appellee as damages is excessive to the extent of

$25,000, and that the judgment should either be set aside because of bias and prejudice on the part of the jury, or else a remittitur of the alleged excess should be required.

Without undertaking to detail the evidence bearing on the damage issue, we think it sufficient to say that if accepted as true the evidence adduced on behalf of appellee was sufficient to show that as a result of the collision appellee suffered shock, a badly lacerated lip, multiple and severe contusions, a brain concussion, permanent brain impairment, fractures of. three ribs, and a rupture of the intervertebral disc between the 3rd and 4th vertebrae. There was also evidence to show that appellee was wholly disabled for a period of 75 or 80 days after he was injured; that for a considerable time he was unable to use his right leg, and had to use crutches when walking; that he had undergone much pain and mental anguish, and in reasonable probability would continue to do so during the remainder of his life; that because of his brain injury he had suffered and in reasonable probability would continue to suffer frequent attacks of nausea, headaches, and dizziness; that he was about 30% partially and permanently disabled; that he was disabled to do hard manual labor; that he could not likely pass a physical examination prerequisite to getting a job; that he was uneducated and was only qualified to do manual labor; that before being injured he had customarily earned an average of $100 per week as an automobile mechanic; that after returning to work he had been unable to work for sustained periods or to do heavy work, and had been able to earn only about $25 per week; and that at the time he received his injuries he was 54 years of age, and had a life expectancy of 18.48 years.

The appellant introduced evidence which would refute that appellee received either a permanent brain injury or a rupture of the intervertebral disc between the 3rd and 4th vertebrae, or that he received any severe or permanent injuries. Its counsel argue that X-ray pictures which accompany the record do not disclose that the space between the 3rd and 4th vertebrae in appellee's spine is narrower, as appellee's doctor testified, than the spaces between other vertebrae in appellee's spine. They also argue that the pictures, when considered together with appellant's medical testimony and with the fact that the doctor who testified for appellee had previously testified for the plaintiffs in numerous cases in which appellee's attorneys had represented the plaintiffs, demonstrate that appellee's medical testimony is not worthy of belief.

The qualifications of the neurosurgeon who testified for appellee met all of the requirements imposed by law. His credibility and the weight to be given his testimony were matters for the jury to pass upon. All of the evidence which is before this court was before the jury, and the same arguments which are here made were no doubt made to the jury. There is nothing in either which would justify this court in usurping the jury's function. We have carefully reviewed the evidence, and when credence is given to that adduced in behalf of appellee, we do not feel that we would be justified in saying that the damages awarded are excessive. See: Texas & N. O. R. Co. v. Coogler, Tex. Civ.App., 209 S.W.2d 778; Herrin Transp. Co. v. Peterson, Tex.Civ.App., 216 S.W. 2d 245, writ refused. Appellant's sixth point is accordingly overruled.

No reversible error having been shown, the judgment of the trial court is affirmed.