**Venice E. HART, Appellant,**

**v.**

**I. L. VAN ZANDT, Appellee.**

**No. 16566.**

Court of Civil Appeals of Texas.

Fort Worth.

Oct. 16, 1964.

Rehearing Denied Nov. 13, 1964.

Geary, Brice & Lewis and W. S. Barron, Jr., Dallas, for appellant.

Cantey, Hanger, Gooch, Cravens & Scarborough and William B. David, Fort Worth, for appellee.

MASSEY, Chief Justice.

This is a malpractice suit.

At the conclusion of the evidence offered by plaintiff Venice E. Hart, the trial court directed the return of a verdict in behalf of the defendant surgeon, I. L. Van Zandt, M.D., an orthopedic surgeon. Judgment was in accord and the plaintiff appealed.

We affirm.

The lumbar spine is the section above the sacral spine. The lumbar spine is comprised of five bony processes or spinal column sections, the fifth being that located immediately above the first of the sacral processes. The term L5S1 denotes the interspace between the fifth lumbar process and the first sacral process. The term L4L5 denotes the interspace between the fourth and fifth lumbar processes. At each of these interspaces in the normal human body there is a disc

which acts as a cushion for the adjacent processes. Immediately to the rear (toward the back) of the bony processes, which are protected one from the other by the discs, there is the canal through which nerves pass. These are enclosed in a protective sac extending from the brain. The term "ruptured disc" denotes a breaking of the outer covering of the disc. When such occurs an opening is afforded through which the softer somewhat flexible body material which should be contained within the disc is allowed to escape. The inner substance is called nucleus pulposus. If the material so extruded should press against the nerve sac and cause pressure or stress against the nerves therein contained, pain, sensory loss, and/or loss of motor function in the skin and muscular tissues often results. Under the diagnosis made by the surgeon in the instant case that character of extrusion was the cause of the trouble of which the plaintiff complained. To alleviate such pressure or stress an operation was undertaken.

Following tests, X-rays, etc. performed pursuant to diagnostic procedures not under attack the defendant surgeon embarked upon an operation upon the plaintiff's back with the pre-operative diagnosis of "probable ruptured disc L5S1, probable lumbarsacral instability". In other words he began operative procedure with the expectation that he would find extruded disc material (nucleus pulposus) pressing against the nerve sac and the nerves therein enclosed, and/or directly upon the nerves as they pass out of the sac and through a spinous opening into the lower extremities. Surgical procedure was begun by the surgeon making an incision which enabled him to open the plaintiff's body and explore the condition existent at the L4L5 level, i. e., that next above the L5S1 level. The plaintiff founds portions of his contentions of negligence in the fact that the surgeon made a "transverse" (cut-across) incision rather than a "lateral" (up and down) incision, in that his deduction therefrom is that the surgeon could not have used the opening made to perform a surgical operation upon the disc

at L5S1. We have concluded that this fact may be disregarded.

At L4L5 the surgeon found a ruptured disc, extruded material from which was pressing against the nerve sac at an adjacent point. He concluded that the condition so found could and did account for the symptoms of plaintiff's complaint. He endeavored to repair the condition, and, in the state of the record, we are bound to conclude that he did do an efficient surgical job thereat. There is no evidence that he did not. He also endeavored to perform a "fusion" of the L4 and L5 spinous processes, objective of which was to cause them to become a single rigid bony part, with the space where the disc should be (or had been) maintained by the insertion of bone particles supposed to merge into and become elements of the single rigid bony part. He then closed the operation, refraining from exploring to determine the condition of the disc at L5S1. Thereafter the resort was to conservative hospital treatment. Later treatment attempted was likewise conservative—at least as applied to the spine itself—until the plaintiff ceased to be the patient of the surgeon.

■ During the course of the introduction of plaintiff's opening evidence he had the surgeon take the stand as an adverse witness. The attorney interrogated the surgeon upon procedure during the course of the operation. Pursuant to a question asked he directed the doctor's attention to the excision or removal of the disc substance, nucleus pulposus, undertaken at L4L5. The surgeon's answer was: "I estimated that approximately 90 percent of his disc substance had been extruded. I removed that. I described that in detail. It was a very long arduous procedure that required approximately four hours, *and I thought at the end of that time that I had removed enough material and that I had given him the relief for which he had come to me.*" (Emphasis supplied.)

That part of the surgeon's answer to which we have supplied emphasis was not

responsive to the question asked, but there was no complaint thereof and no motion to strike. We believe, therefore, that the evidence was properly in the record as a part of the plaintiff's case. In other words the record showed that the surgeon had truly formed the opinion and believed, at and prior to the conclusion of his operative procedure at L4L5, that he had discovered and corrected the condition of defect which was causing the symptoms of which the plaintiff complained, and that there was no other condition of defect remaining which required exploration or operation. There was no evidence that the action, or cessation from further operative procedure, was not the result of the surgeon's exercise of judgment.

Some five months after this operation discovery was made of the existence of a ruptured disc at L5S1 with extrusion of disc material causing pressure against the nerve sac at that level of the spine. The plaintiff contends that the fact issue was therefore raised as to whether such pressure existed, causing his complaints or some of them, at the time of the prior operation at the L4L5 level.

That the surgeon had the opinion that there was a condition requiring his attention at L5S1 when he began the original operation became immaterial, even though plaintiff be deemed correct in his contention that it later became apparent, at the time a second operation was performed about 5 months later, that he had been correct in his original opinion (that there was a condition which should have been operated at L5S1),—and was in error in his conclusion (because of his findings at L4L5) that his original opinion was incorrect.

■ There having been no evidence that the surgeon was negligent in arriving at the new conclusion by reason of his findings at L4L5, no evidence that he had not actually made such new conclusion, and no evidence that it was not bona fide, no issue upon the matter of negligence was ever raised. The period under consideration was to and in-

clusive of the time the operation was concluded. Under the evidence there was no proof that the surgeon had done anything other than rightfully act in the exercise of judgment requisite in the circumstances, by reason of which he was entitled to cease operative and exploratory activity. No blame would attach, or cause of action accrue, because of action taken or because he refrained from further action. 45 Tex. Jur.2d, p. 282 "Physicians and Other Healers", § 117 "(Standards of Skill and Care)—In general"; 41 Amer.Jur., p. 217, et seq., "Physicians and Surgeons", § 103 "Professional Judgment Not Guaranteed", and § 104 "Cure Not Guaranteed."

Remaining, and as matter which has caused us great concern, is the question of whether an issue of fact was raised as to the surgeon's negligence amounting to proximate cause of plaintiff's injuries in failing to undertake proper postoperative treatment. We have concluded that the best manner of resolving the problem would be to treat the acts and omissions of which complaint is made as having amounted to negligence (although without making any holding of negligence) and applying ourselves to the question of whether they were shown to have amounted to a proximate cause of plaintiff's injuries and damages.

We conclude, and it is our holding, that there was no proof that the alleged negligence amounted to proximate cause.

■ Bowles v. Bourdon, 148 Tex. 1, 219 S.W.2d 779, 13 A.L.R.2d 1 (1949) is a leading case. Following it on page 11 of A.L.R.2d is the annotation, "Proximate cause in malpractice cases". In connection therewith we have studied 115 A.L.R. 298, Annotation: "Liability as for malpractice as affected by failure to take or advise the taking of an X-ray picture after operation, or to resort to other means of determining advisability of a supplementary operation or special treatment." With certain authorities cited it is stated in Bowles v. Bourdon: "It is definitely settled with us that a patient has no cause of action against his doctor for

malpractice, either in diagnosis or recognized treatment, unless he proves by a doctor of the same school of practice as the defendant: (1) that the diagnosis or treatment complained of was such as to constitute negligence and (2) that it was a proximate cause of the patient's injuries." Citing Wigmore on Evidence, Vol. VII, p. 453, § 2090, the author of the opinion apparently recognizes as the "main negligence issue" in cases for malpractice against a physician or surgeon the question of whether the attendant doctor had used "suitable professional skill", with the question of proximate cause likewise existent and necessary to be established by evidence as the cause of patient's injuries in those instances where want of the exercise of "suitable professional skill" has been shown. The author of the opinion then proceeds to treat the negligence alleged as having been raised as an issue of fact and settles the case disposition by holding that the issue of proximate cause was not likewise raised. Concluding, he states: "All it (the evidence) shows is that what respondent did was not a probable but only a possible cause of the contracture; that it was only one of several things that *could* have caused the injuries complained of. Therefore, this cause is ruled by the language of Circuit Judge Taft, in Ewing et al. v. Goode (78 F. 442, 444), supra, 'when the burden of proof is on the plaintiff to show that the injury was negligently caused by defendant, it is not enough to show the injury, together with the expert opinion that it might have occurred from negligence and many other causes. Such evidence has no tendency to show that negligence did cause the injury.'

"And if the plaintiff would rest upon inferences rather than upon direct evidence, he meets the same rule. 'The proof must establish causal connection beyond the point of conjecture. It must show more than a possibility. Verdicts must rest upon reasonable certainty of proof. Where the proof discloses that a given result may have occurred by reason of more than one proximate cause, and the jury can do no more than guess or speculate as to which was, in fact, the efficient cause, the submission of such choice to the jury has been consistently condemned by this court and by other courts.' "

■ Reverting to the state of the whole record in the case, we find circumstances in connection with the treatment (which for the sake of our method of handling we assume to have constituted negligence) which perhaps shows that the condition of injury following the operation might have occurred from omissions to resort to treatment and/or supplementary surgery by the defendant surgeon;—which perhaps shows that the plaintiff's ultimate condition of injury resulted from negligence on the surgeon's part. The most such evidence showed the jury, however, was that such alleged and presumed negligence was a *possible* cause of the trouble plaintiff experienced following his operation. Causal connection was not established beyond the point of conjecture. Had the case been submitted the jury could have done no more than to guess or speculate as to whether the acts and omissions of the surgeon, singly or collectively, following the time of the operation, was or were the efficient cause(s) of the worsened condition in which plaintiff alleged himself to have been.

In this connection we first consider plaintiff's condition prior to surgery. Immediately prior to the time the surgeon applied the tests to which he resorted in the process of arriving at a diagnosis the plaintiff claimed to have been experiencing pain, inconvenience and disability, as follows: In 1959 for several months prior to the visit to the defendant surgeon plaintiff had been having trouble in his lower back and his left leg. About September 16, 1959, he alighted from an automobile and then reached back inside it for something and in so doing made a "sort of a twisting motion" and a sharp piercing pain was experienced in his back. This pain was in the lower back, "just above the tailbone". He went to the surgeon on the same day. At the

time he saw the surgeon he was having difficulty in the lower back and left hip and leg. The surgeon put him in the hospital, in traction. He was in the hospital about a week. The treatment relieved the intense pain, but some traces of it remained. He continued under the surgeon's treatment after leaving the hospital. He continued to have pain in the left leg, and the top part of his left foot was numb. Also there was a "spot" on the front of the left leg which was numb. During the period of conservative treatment after leaving the hospital the only sensory loss was that to the top part of the left foot, and there was no pain in any portion of the body other than those in which it had been previously experienced. The surgeon expressed his opinion that plaintiff had a "fractured" disc which should be removed.

Pursuant to arrangements between doctor and patient the plaintiff was again hospitalized on October 11, 1959. The next day a myelogram was attempted. The process by which this was done was "terribly painful". The day following an additional attempt to perform a myelogram was undertaken. A discogram was also performed. Later, on the same day, the surgeon performed a radical operation during the course of which he operated at the L4L5 level of the spine.

Immediately following the operation it became apparent to the plaintiff that he was unable to void. His bladder was filling up, and to empty it a catheter had to be used. Within a few days it became apparent that he could not void his bowels. Both conditions resulted in pain and discomfort. The plaintiff "wore that catheter until around the first of February 1960". Plaintiff had terrible pain in both his legs for a few days, but this intense pain subsided. The plaintiff had loss of sensation, increased in the sites where such loss had previously been experienced, and also in new portions of the body and extremities. The left foot was "still paralyzed" on top and seemed to be much weaker. There was no strength in the large toe of that foot. The numb

spot on the left leg was still present. In addition the right side of his penis was numb, his right testicle was numb, and "a streak along the right side of the rectum was completely numb, paralyzed. All in the crotch area, on the right side" extending back to the tailbone. The plaintiff remained in the hospital about four weeks. During this period there was no improvement of the bowel and bladder condition. There was no change in the losses of sensation. The pain in the legs was reduced so that by two weeks after the operation it was practically gone.

After dismissal from the hospital the plaintiff continued to see the surgeon in his office. The surgeon never recommended additional hospitalization, surgery, myelograms, or X-ray studies. He told the plaintiff that his condition would clear up and there was nothing to worry about—it would take a little time. He first said it would be a week or two, then that it would be maybe a month or two, and finally told him that it might be a matter of several months. The plaintiff asked the surgeon "if there was any possibility of going back in there and seeing what was wrong, correct something, see if there was something could be done." The surgeon advised that there was no reason to do so, there was nothing wrong, and that with time the difficulty would clear up.

During the period of his treatment by the surgeon following the operation the plaintiff was referred to another doctor for attention to clear up the bladder trouble, and this doctor put plaintiff in the hospital and performed a prostate operation as part of his treatment. Plaintiff testified that this was of no aid or benefit to him. Further, the surgeon referred plaintiff to a Dr. McKinney for an examination. This was in December of 1959. Dr. McKinney told the plaintiff that he would be all right in the matter of a little time.

On December 15, 1959, Dr. McKinney wrote a report in connection with his examination of plaintiff, a copy of which went

to the defendant surgeon. From and after the time of receipt of such copy the defendant surgeon was "on notice" of its contents. It was apparent therefrom that Dr. McKinney was "laboring under the impression" that the operation performed had been at the lumbosacral joint with removal of the 5th lumbar disc. In other words the report showed that Dr. McKinney thought that the operation had been at L5S1 rather than at L4L5, and that there had been an interbody fusion at L5S1. It was in connection with recommendations Dr. McKinney made that plaintiff had another doctor operate on his prostate in an attempt to correct his bladder dysfunction. Dr. McKinney's report noted the anesthesia over the right side of plaintiff's perineum, scrotum, and penis, and that these areas are supplied by the 3rd, 4th and 5th sacral nerves. From other evidence in the record it is apparent that these nerves ordinarily pass out of the interspace at the L5S1 spinal level, although in some instances they pass out of the interspace at the L4L5 level. In any event they are present, enclosed by the nerve sac within the spinal column, at the L4L5 level even when they emerge therefrom at the L5S1 level.

In May of 1960 the plaintiff went to a Dr. Rehfeldt, M.D., a specialist in neurological surgery. As heretofore mentioned the defendant surgeon was a specialist in orthopedics. The school of education, training and practice of the two specialties differ in certain respects although similar in most. One difference is that advocates of one school believe that "spinal fusion" done in connection with a disc operation is not procedure which is in the best interest of the patient. Advocates of the other believe the contrary. Specialists of both schools ordinarily perform operations to remove discs, or to correct malfunctions resulting from ruptured discs.

After performing tests Dr. Rehfeldt diagnosed L5S1 as the portion of the spine where pressure from a ruptured disc was causing plaintiff's trouble. He performed an operation by which extruded disc material from the L5S1 disc was removed. He testified that as a result pressure upon the nerves in plaintiff's spinal column ceased. Incident to this second operation additional or newly formed disc material at the L4L5 level was also removed. There was no evidence that the additional or newly formed disc material at L4L5 played any part in plaintiff's complaints or condition and the fact thereof may be disregarded. Following the operation by Dr. Rehfeldt the plaintiff was in the hospital about one week, after which he went home. After two or three weeks at home he returned to some of his duties of employment. Following the operation by Dr. Rehfeldt the plaintiff obtained no relief in so far as his bowel and bladder troubles were concerned. Neither was he relieved of his numbness, i. e., sensory loss. There was relief from pain. Prior to the operation the plaintiff had experienced pain in his legs sometimes, which he stated was alleviated following the operation.

The evidence adduced from Dr. Rehfeldt was silent upon the matter of whether he found that the 3rd, 4th, and 5th sacral nerves, or any of them, to have come out of the spine at L5S1. The record is silent upon the matter of whether any nerve was within the sac in plaintiff's spine at that level, although the presence thereat of the nerve sac was shown.

Plaintiff was of the opinion that there was a pressure on the sacral nerves at L5S1, which pressure had been increased by the defendant surgeon's operative procedures. He believed that the surgeon should not have increased the pressure at L5S1, or, that having done so, the surgeon should have explored and discovered the condition existent at L5S1, which he should have corrected at the time he operated at L4L5. Further, plaintiff was of the opinion that whether or not there was such additional pressure caused by the operation, the failure to diagnose plaintiff's condition so as to occasion prompt supplemental remedial surgery to correct the condition existent at L5S1 permitted the condition to persist for so long a period of time that permanent injury resulted,—since if the remedial sur-

gery had been earlier undertaken the condition would have been alleviated, nerve atrophy avoided, and a complete cure effected. Alternatively, his opinion was that a partial cure could have been effected and plaintiff's condition improved rather than worsened. The proof adduced, as directed to the subject of our discussion, was produced in an attempt to support this theory, or these alternative theories, as establishing a prima facie case of liability.

As heretofore indicated causal connection was not established beyond the point of conjecture.

■ In connection with such holding, we follow the decision of Bowles v. Bourdon, supra, i.e., that in a malpractice case the plaintiff patient has not established a cause of action unless he proves by a doctor of the same school of practice as the defendant physician that the negligence of which he complains was a proximate cause of his injuries. Plaintiff offered no evidence thereof by an orthopedic physician or surgeon who was an M.D. In any event, however, proximate cause was not proven by any other expert witness, without consideration given to qualification.

■ The plaintiff founds a point of error upon the action of the trial court in excluding the whole of the deposition of Dr. Michael Scott, M.D., Chairman and Professor of the Department of Neurosurgery in Temple University Medical Center, Philadelphia, Pennsylvania. He had examined the plaintiff on December 7, 1960. For purposes of his bill of exceptions the plaintiff obtained the trial court's ruling that the surgeon's objections were substained to each question and answer, severally considered. The material answers plaintiff insists should have been admitted in evidence amount to a statement by the medical witness that in his opinion there was involvement of the plaintiff's nerve roots, with resulting impairment of sensation and in the function of the bladder; that such resulting impairment was secondary to prior involve-

ment of the nerve roots and was an impairment which occurred during or immediately following the operation performed by the defendant surgeon. The medical witness stated that the reasons for such conclusion was that the plaintiff did not have these symptoms or complaints before the operation, but did have them immediately following.

Had the witness' testimony been admitted, yet do we believe that plaintiff would not have discharged the burden of proving a prima facie case. The evidence is no more than an expression of an opinion as to the time of some event which the witness concluded was the proximate cause of a resulting condition. It does not connect any particular event to any particular act or omission, or combination thereof, which the witness concluded was negligence—or to acts or omissions which the jury would be entitled to find amounted to negligence in considering the whole record. In other words, negligence on the part of the defendant surgeon could not have been established by admitting the witness' testimony.

In the early part of this opinion we dealt with the question of the surgeon's negligence to and including the very time he consummated his operative procedure. We concluded that negligence was not proved. There is likewise an entire want of evidence of the existence of negligence because of any act or omission "immediately following". If an act or omission, or combination thereof, existed as the proximate cause of the plaintiff's condition immediately following the operation, it was part and parcel of the operation itself. Pertaining thereto we have written that there was no evidence that the surgeon was negligent in arriving at his new conclusion, by reason of his findings at L4L5, that he had discovered and corrected the condition of defect, and that there was no other condition of defect which required further exploration or operation.

Exclusion of the evidence tendered, even if erroneous, would not constitute reversible

error. Had it been admitted, yet would plaintiff have continued in the position of having failed to make out a prima facie case.

Judgment is affirmed.