Venice E. HART, Petitioner,

v.

I. L. VAN ZANDT, Respondent.

No. A–10513.

Supreme Court of Texas.

Nov. 3, 1965.

Rehearing Denied March 2, 1966.

Geary, Brice & Lewis, W. S. Barron, Jr., Dallas, for petitioner.

Cantey, Hanger, Gooch, Cravens & Scarborough, William B. David, Fort Worth, for respondent.

GRIFFIN, Justice.

This is a medical malpractice case. Venice E. Hart, as plaintiff, sought by this suit against Dr. I. L. Van Zandt, the defendant, to recover damages for various permanent physical injuries such as sensory losses to his leg and foot and malfunction of elimination organs allegedly resulting from an operation performed on his lower back by defendant and from various acts and omissions on the part of defendant in connection with the post-operative care and treatment of plaintiff. At the conclusion of plaintiff's evidence, defendant filed a motion for peremptory instruction. Upon sustaining this motion the trial court instructed the jury to return a verdict for the defendant and the court entered judgment that plaintiff take nothing. From this judgment the plaintiff appealed to the Court of Civil Appeals where the trial court's judgment was affirmed. 383 S.W.2d 627. Mr. Hart is the petitioner.

The numerous points of error in this appeal resolve themselves into two basic questions, to-wit:

(a) Whether the record contains any evidence which would support a jury finding or findings that Dr. Van Zandt was guilty of actionable negligence in his operation upon, care and treatment of Mr. Hart; and

(b) Whether the record contains any evidence which would support a jury finding or findings that any one or more of such alleged acts of negligence was a proximate cause of Mr. Hart's injuries.

In determining negligence in a case such as this, which concerns the highly specialized art of treating disease, the court and jury must be dependent on expert testimony. There can be no other guide, and where want of skill and attention is not thus shown by expert evidence applied to the facts, there is no evidence of it proper to be submitted to the jury. The burden of proof is on the plaintiff to show that the injury was negligently caused by the defendant and it is not enough to show the injury together with the expert opinion that it might have occurred from the doctor's negligence and from other causes not the fault of the doctor. Such evidence has no tendency to show that negligence did cause the injury. Ewing v. Goode, 78 F. 442, 444 (C.C.Ohio, 1897); Bowles v. Bourdon, 148 Tex. 1, 219 S.W.2d 779 (1949); Porter v. Puryear, 153 Tex. 82, 262 S.W.2d 933 (1954).

In determining the question of proximate cause, the general rule is "that proof

of causation must be beyond a showing of a possibility that the injuries arose from the defendant's negligence or lack of skill, since the jury will not be permitted to speculate as to the cause of the injury. Thus where the evidence most favorably to the plaintiff develops more than one equally probable cause, for one or more of which defendant is not responsible, the plaintiff has failed to sustain his burden of proof." 13 A.L.R. 2d 22. But, as stated by this Court in Porter v. Puryear, supra, "[t]he vital inquiry in any case involving proximate cause is whether the negligent act set in motion a natural and unbroken chain of events that led directly and proximately to a reasonably foreseeable injury or result." (262 S.W.2d 933, 936.)

█ In order that we may determine whether the plaintiff has discharged this burden with respect to the question of negligence and proximate cause, we must view and interpret the evidence in the light most favorable to the plaintiff, disregarding all evidence and the inferences therefrom favorable to the defendant. Cartwright v. Canode, 106 Tex. 502, 171 S.W. 696 (1914); White v. White, 141 Tex. 328, 172 S.W.2d 295 (1943); Ford v. Panhandle & Santa Fe Ry. Co., 151 Tex. 538, 252 S.W.2d 561 (1952).

Mr. Hart first became a patient of Dr. Van Zandt in 1951, when Dr. Van Zandt diagnosed and treated Mr. Hart for a ruptured disc at the L5 S1 level in a sub-acute condition. Mr. Hart responded to conservative treatment at this time and thereafter did not have much trouble with his back until September, 1959.

By way of explanation, the human spine consists of various segments of bone. In between the vertebral bones is cartilaginous material, commonly referred to as discs, which take part in the movement of the spine and perform the function of a shock absorber. Starting from the top of the spine downward, the first seven vertebrae are called cervical vertebrae; the next twelve, thoracic (or dorsal); the next five lumbar,

followed by the sacrum, and then the coccyx—commonly called the tail bone. The medical profession has assigned numbers to these various vertebrae, and those of the lumbar region from top to bottom are numbered L1, L2, L3, L4 and L5. The segments of the sacrum are also numbered, and the first segment is S1, followed by S2 and S3. When reference is made, for instance, to the L4 L5 interspace, this means the space between the fourth and fifth lumbar segments. Likewise, the L5 S1 intervertebral space refers to the space between the fifth lumbar and the first sacral segments which is occupied by the L5 S1 disc.

On September 15th or 16th, 1959, Mr. Hart, while getting out of his car at his place of work, reached back into his car with a "sort of twisting motion" and a pain struck him in the lower back region like some one "had stuck a knife in" his back. Mr. Hart went to Dr. Van Zandt the same day about this condition and reported to him the symptoms. On examination the doctor observed that the movements of Mr. Hart's lower back were markedly restricted and painful. On the same day, Dr. Van Zandt requested that Mr. Hart be admitted to Harris Hospital. At this time Mr. Hart was given conservative treatment which consisted of applying traction to his legs to relieve the pressure on the sacral nerves. Throughout this treatment it was apparent that Mr. Hart was having a revert pain down his left sciatic nerve (this nerve goes down into the hip and back of the left leg), which was caused by "involvement of the nerve roots" in Mr. Hart's lower back. Other than the pain going down his left leg, Mr. Hart had no motor or sensory losses to any part of his body. X-rays taken at this time indicated a narrowing of the intervertebral disc space at the L5 S1 level. Mr. Hart remained in Harris Hospital for eight to ten days at which time he was released but continued to receive treatment from the physical therapist at the doctor's office. He appeared to be losing ground, and after an office visit on October 7, Dr. Van Zandt recommended that he re-enter

Harris Hospital for tests and probable surgery.

Mr. Hart was re-admitted to the hospital on October 11, 1959. During the period from the date of his previous release from the hospital until the date of re-admission, Dr. Van Zandt had made two additional findings with regard to Mr. Hart's condition: (1) The patient developed a tenderness at the lumbo-sacral area of his back (this is the point where the lumbar and sacral segments of the spine join, i. e., the L5 S1 interspace), and (2) he developed a numbness on the top of his left foot with accompanying loss of motor power to the toe. At this time Mr. Hart was fifty-four (54) years old. Dr. Van Zandt testified that the nerve which feeds the muscles which control the toes could come from the L5 S1 area of the spine.

Dr. Van Zandt's first admitting diagnosis was "possible lumbro-sacral instability." On October 12, Dr. Van Zandt's progress report on Mr. Hart stated:

"* * * myelogram unsuccessful this A.M. Dr. O'Bannon got a large hematome. Discogram at L4 L5 showed a good disc here. For disc and fusion at L5 S1 levels tomorrow."

The anaesthesia report of October 13, stated:

"* * * Diagnosis, Pre-Operative. Probable ruptured disc L5 S1. Probable Lumbar-sacral instability."

The operating room nurse's report on October 13 stated:

"Pre-Operative Diagnosis. Probable ruptured disc lower back. Lumbosacral instability."

Dr. O'Bannon, who was the radiologist consulted by Dr. Van Zandt in connection with the operation on Mr. Hart, testified that he examined and interpreted various x-rays of Mr. Hart's back prior to the operation and the only thing of diagnostic significance which Dr. O'Bannon noted was the narrowing of the disc at the L5 S1 level. Dr. O'Bannon could detect no abnormality whatever at the L4 L5 level. This finding was consistent with Dr. Van Zandt's pre-operative diagnosis of a ruptured disc at the L5 S1 level.

With the pre-operative diagnosis pointing to trouble at the L5 S1 level, Dr. Van Zandt, on October 13 proceeded to operate on Mr. Hart by making a five-inch lateral, or "traverse," incision at the L4 L5 level of the lower back. During the course of a four-hour operation Dr. Van Zandt did not even examine the intervertebral space at the L5 S1 level. At the L4 L5 interspace, Dr. Van Zandt removed the posterior section of the annulus fibrosis; the anterior section of the annulus fibrosis and the left and right walls of the disc were left in place. The doctor then attempted a bone fusion by taking three pieces of bone from the superior iliac crest and spine and placing them between the vertebral bodies between the L4 and L5 interspace. Immediately following surgery, Mr. Hart developed the following symptoms: (1) an inability to empty the bladder, and (2) numbness over the right side of the perinium (this is the crotch area), scrotum and penis. In other words, Mr. Hart had a lack of natural feeling in and around the above described areas.

The sensory feeling in the area wherein Mr. Hart is numb is supplied by sacral nerves. Beginning at approximately the first lumbar vertebra, the sacral nerves pass through the spinal column in what is called the cauda equina. At each lumbar vertebra the cauda equina is found to be located between the lamina of the vertebra and the intervertebral disc (the posterior section of the intervertebral disc would, therefore, be nearest to the cauda equina). The first, second, third, fourth and fifth sacral nerves pass through the spinal column in the cauda equina at the L4 L5 and the L5 S1 level. At each intervertebral space following the first lumbar vertebra, a nerve root extends from the cauda equina to the right and left of the intervertebral disc.

A rupture of an intervertebral disc produces pressure against the nerve structure; either against the cauda equina or against the nerve roots that extend from the cauda equina at each vertebra interspace, i. e., the pressure may be against the nerve roots going out at each level or the pressure may be directly against the nerve roots which are still present inside the cauda equina. The pressure resulting from the ruptured disc is called "extra dura pressure" ("dura" is the outer covering of the nerve tissues).

Each intervertebral disc is composed of two parts: (1) the outer part, known as the annulus fibrosis, is a cartilaginious material that holds the disc in place, and (2) the inner part, known as the nucleus pulposus, which is a soft substance that protrudes through the annulus fibrosis when the disc is ruptured. Extra dura pressure may be caused by the nucleus pulposus extruding through the annulus fibrosis and pressing against either the cauda equina or the nerve roots.

After leaving the hospital following Dr. Van Zandt's operation, Mr. Hart had frequent office visits with the doctor. He was unable to void his bladder or bowels and had areas of numbness and lack of feeling. For the bladder condition Dr. Van Zandt referred Mr. Hart to Dr. Compere, a reputable urologist who performed a prostate operation in January, 1960, and relieved Mr. Hart's bladder involvement to the point that Mr. Hart no longer wore a catheter for bladder relief. Dr. Van Zandt did not recommend additional surgery nor did he perform any additional myelograms or other diagnostic studies following the surgery other than to make x-ray pictures.

During December, 1959, Dr. Van Zandt sent Mr. Hart to a neurological specialist, Dr. William W. McKinney. On December 15 Dr. McKinney examined Mr. Hart and found that "the patient has some anesthesia over the right side of the perinium, the scrotum and the penis." Dr. McKinney's diagnosis was that the patient has suffered injury to the nerves which resulted in the patient's condition; "it is my impression that this patient has had some trauma to the lower sacral nerves which has resulted in his bladder dysfunction." Dr. Van Zandt directed Mr. Hart to Dr. McKinney without telling him that he had not operated at the L5 S1 interspace—an omission which Dr. McKinney testified would have changed his procedure and treatment of Mr. Hart. He testified that if he had not been under the false impression that Dr. Van Zandt had removed a disc at the L5 S1 level, he would have considered nerve root compression at the L5 S1 level to be a strong possibility in this case. Dr. McKinney stated that a fusion, or protusion, at either the L4 L5 or L5 S1 interspace could cause pressure to be exerted on the nerve roots with resulting damage thereto. He further stated that if a central extrusion of the disc over the L5 S1 interspace is allowed to exert continuing pressure on the cauda equina and nerve roots and is not removed within a relatively short period, permanent and irreparable injury will result; and that nerve root involvement was responsible for Mr. Hart's condition with regard to the numbness of certain areas of his body. Dr. McKinney testified that as soon as the diagnosis of the ruptured disc at L5 S1 was made, the disc should have been removed. He further testified that it was not his regular procedure to allow a centrally extruded disc to remain with the symptoms that were existing in Mr. Hart's case.

In May of 1960, Mr. Hart decided to leave Dr. Van Zandt and go to another doctor to try to obtain some relief. He went to Dr. Frederick C. Rehfeldt, a specialist in neurological surgery. On May 10, 1960, Dr. Rehfeldt began treating Mr. Hart. Hospital records were put in evidence showing the findings of a myelogram study requested by Dr. Rehfeldt on June 12, 1960. The conclusions of the myelogram tests were:

"1. Large irregular obstructing space occupying lesion predominantly to the right of the level of the intervertebral disc between L4 L5 as shown by myelogram.

2. No demonstrable abnormality of the lumbar spinal canal above the level of L4.

3. Slight residual iodized oil in the spinal canal distally from previous myelogram.

4. Post-operative changes involving L4 L5 as noted above.

5. Narrowing of discs between L4 L5 and L5 S1."

The records of Dr. Rehfeldt further showed that the numbness and lack of natural feeling suffered by Mr. Hart were due to nerve root compression. On June 27, 1960, Dr. Rehfeldt performed surgery on Mr. Hart. During the course of the operation Dr. Rehfeldt found that the nerve roots were compressed at the L4 L5 level. He also found that the intervertebral disc at the L5 S1 level was ruptured and was compressing the dura sac. Dr. Rehfeldt then removed the discs at L4 L5 and at L5 S1 which effected "decompression of L4 L5 bilaterally and L5 S1 bilaterally." A bar of matter was found extruding at L4 L5, pressing against the nerve root that comes off at this interspace. Dr. Rehfeldt said that if nerve root pressure was allowed to exist for a year or two, even though subsequent surgery removed the pressure on the nerve roots, there could be substantial damage to the nerves which would not heal; and although Mr. Hart showed some signs of improvement following the decompression of the nerves at L4 L5 and L5 S1, the doctor could not detect any differences in Mr. Hart's sensory losses. Dr. Rehfeldt testified that both the L4 L5 and L5 S1 areas should be looked at when a patient has the symptoms of Mr. Hart, and that if he had a patient with a previous history of trouble at the L5 S1 level, he would under normal procedure expose the L5 S1 area for review during surgery. He further stated that if a man is unsuccessfully operated on and there is nerve root pressure, following the operation which is allowed to exist for a year or two, there could be substantial

damage done to the nerve roots which a subsequent operation would not cure. Essentially, Mr. Hart's condition has remained unchanged since the date of Dr. Van Zandt's operation up until the trial of this case.

Dr. Charles M. Hawes, a Doctor of Osteopathy (whose qualifications as a medical witness will be subsequently examined in this opinion), testified by deposition that in his opinion a doctor in the exercise of ordinary skill and care as employed by others in the medical profession in the Dallas-Fort Worth area, would have made an incision so as to expose the L5 S1 interspace during the course of an operation such as was performed by Dr. Van Zandt. He further testified that it was customary to explore both the L4 L5 and the L5 S1 interspace. The post-operative conditions of Mr. Hart were also outlined to Dr. Hawes, and in answer to hypothetical questions he stated that in his opinion, a doctor in the exercise of ordinary care and skill, when confronted with the symptoms of Mr. Hart immediately following the operation should have done exactly what was later done, viz.: to perform a myelogram and surgery. He further testified that, assuming an operation at the L4 L5 level but a diagnosis of a ruptured disc at the L5 S1 level, it would not be in the exercise of ordinary skill and care in the Dallas-Fort Worth area to fail to go in and remove the disc at the L5 S1 level. To the same effect he testified that under the facts of Mr. Hart's case a laminectomy should have been performed on the patient for the removal of the L5 S1 disc at the time of Dr. Van Zandt's operation.

It was Dr. Hawes' opinion that Mr. Hart had a permanent involvement of the sacral nerves, and, based on reasonable medical probability, a delay in further surgery on a patient suffering from Mr. Hart's symptoms immediately following the October, 1959 operation would cause or result in permanent damage to the sacral nerves. He further stated that Mr. Hart's condition following the October, 1959 operation was caused by extra dural pressure at the L4 L5 and at the L5 S1 levels.

The petitioner, in his Fourth Amended Original Petition, has alleged that twelve various acts and omissions on the part of Dr. Van Zandt constituted actionable negligence proximately causing his injuries. Included therein are the following allegations:

\* \* \* \* \* \*

"(g) In failing to explore other vertebral bodies and intervertebral discs during surgery at the L–4, L–5 level.

(h) In failing to perform surgery on and remove a herniated, ruptured, or otherwise diseased intervertebral disc at the L–5, S–1 level.

\* \* \* \* \* \*

(j) In failing to perform additional surgery after the first operation to decompress the pressure which was then being exerted to the nerves and/or nerve roots in Plaintiff's back."

■ Although the writer of this opinion, after a detailed study of the record, would affirm the Court of Civil Appeals' judgment, the Court has directed the cause be written that fact issues of negligence and proximate cause are raised with regard to the above quoted allegations.

The Court is of the opinion that it would be unrealistic to hold that the above described testimony does not present a question of fact upon which reasonable minds could differ. It is not for this Court to decide whether or not Dr. Van Zandt's failure to explore other vertebral bodies during his operation, failure to perform surgery at the L5 S1 level, or his failure to perform additional surgery after the initial operation was in fact negligence proximately causing Mr. Hart's injuries. Rather it is for this Court to decide whether or not the evidence in the record presents facts which must be passed upon by the jury. We hold that issues of negligence and causation have been raised that can only be resolved by the trier of fact, and that it was error for the courts below to sustain respondent's motion for peremptory instruction.

Since this case is to be remanded for a new trial, it is necessary to pass on additional matters properly before the Court.

Respondent's motion for peremptory instruction contained twenty-six numbered paragraphs. In sustaining this motion, the trial court held it "to be good in all its features." Except for paragraphs 10, 11 and 19 the entire motion resolved into the questions of negligence and proximate cause heretofore decided. Paragraphs 10, 11 and 19 allege that petitioner failed to prove the essential elements of his cause of action "by a doctor of the same school of practice as defendant." All of the doctors who testified, with the exception of Dr. Charles M. Hawes, who is an osteopath, hold M. D. degrees, so it is apparent that the objections in paragraphs 10, 11 and 19 are leveled at the testimony of Dr. Hawes.

■ In Bowles v. Bourdon, supra, 219 S. W.2d, at page 782, this Court announced the general rule with respect to the type of evidence necessary to establish a cause of action in a medical malpractice case in the following language:

"It is definitely settled with us that a patient has no cause of action against his doctor for malpractice, either in diagnosis or recognized treatment, unless he proves by *a doctor of the same school of practice as the defendant*: (1) that the diagnosis or treatment complained of was such as to constitute negligence and (2) that it was a proximate cause of the patient's injuries." (Emphasis added.)

In Porter v. Puryear, supra, 262 S.W.2d at page 936, this Court recognized that where the particular subject of inquiry is common to and equally recognized and developed in all fields of practice, a qualified surgeon of any recognized school of medicine may give evidence on the matter under inquiry.

■ Dr. L. B. Hurt, who was qualified as a medical doctor and as an osteopathic doctor, testified that the subject of a laminectomy for back exploration and removal of a ruptured disc was equally recognized in both schools of medicine, and that it was equally developed in both schools of practice, because both schools use the same text books, have available the same information and read the same literature on the subject of surgical laminectomy. We therefore hold that as to the subject of inquiry in this case, the testimony of Dr. Hawes was properly admitted into evidence by the trial court.

By Points of Error Ten and Eleven, petitioner assigns error to the trial court in excluding the deposition testimony of Michael Scott, M. D. For purposes of his bill of exceptions the petitioner obtained the trial court's ruling that the respondent's objections to this evidence were sustained to each question and answer, severally considered.

Dr. Scott holds an M. D. degree and is licensed to practice neurosurgery in the State of Pennsylvania. It is apparent that both Dr. Scott and Dr. Van Zandt are of the same school of practice, that is, they are both licensed to practice medicine with an M. D. degree. Mr. Hart, in December of 1960, went to see Dr. Scott in an effort to obtain some relief from his condition. At that time Dr. Scott was given a history of Mr. Hart's case and made an examination of the patient. Dr. Scott also had some correspondence with Dr. Rehfeldt and Dr. Van Zandt with regard to Mr. Hart's case history. In Dr. Scott's opinion, "the involvement of the nerve roots, the impairment of sensation, the impairment in the function of involvement of the bladder was secondary to some involvement of the nerve roots which occurred during or immediately following the operation of October 13, 1959."

■ We are of the opinion that Dr. Scott was in a position to render an expert opinion with regard to the cause or causes of Mr. Hart's condition. We therefore hold that it was error for the trial court to exclude the deposition of Dr. Scott.

The judgments of the Court of Civil Appeals and the trial court are reversed and the case is remanded for new trial in accordance with this opinion.

## ON MOTION FOR REHEARING

SMITH, Justice (dissenting).

I respectfully dissent. When the Court's original opinion was written, I assumed that the facts set out in the opinion were controlling and were directly related to the issues involved. However, upon reading the motion for rehearing and upon a closer examination of the record, I find that I cannot agree with the result attained by the Court. This Court, in my opinion, has unwittingly permitted the petitioner the advantage of another trial because of its acceptance of petitioner's inaccurate presentation of evidence elicited from expert witnesses based upon hypothetical questions which failed to properly embrace facts established or facts reasonably inferable from the evidence. I disagree with the petitioner's contention that the respondent has overlooked settled principles of law such as the rule that a party in propounding hypothetical questions is entitled to a witness' opinion upon any combination of facts inferable from the proof.

This record, in my opinion, is completely void of elements of proof which are essential to a recovery by the plaintiff. The defendant contends, and my examination of the record confirms, that there is no evidence that the defendant, at the time of performance of the operation of October 13, 1959, should have explored the L5 S1 disc. Evidence of what is usually or customarily done is not expert evidence of what should have been done by the defendant prior to, during, and subsequent to the surgical operation on the plaintiff. The very evidence of what is usual and customary under the circumstances, such as

confronted the defendant, implies that there are cases when it is proper not to conduct exploration at a different level. The Court after correctly announcing the rule that "[in] determining negligence in a case such as this, which concerns the highly specialized art of treating disease, the court and jury must be dependent on expert testimony," promptly proceeded to ignore the rule in the above particular and in the following respects:

(1) There is no expert evidence that had the defendant explored the L5 S1 disc during surgery at the L4 L5 level he would have discovered a disc requiring operative correction or removal. Not once did an expert witness testify that in his opinion a disc requiring surgical correction or removal existed at L5 S1 when defendant performed surgery on October 13, 1959. Without expert evidence of that kind it is impossible to reasonably conclude that the failure of defendant to explore at L5 S1 at that time caused any of the problems of which plaintiff complains. At best, the presurgical diagnoses were inconclusive. Defendant diagnosed "possible" lumbo sacral. disc and "possible" lumbo sacral instability. The diagnosis made by Dr. O'Bannon before surgery was of a suggestion of a rupture of the disc at L4 L5. Such evidence is a far cry from "expert evidence applied to the facts" that exploration of the L5 S1 disc would have revealed it to be in such a condition as to require its removal on October 13, 1959.

(2) There is no expert evidence that, under the particular facts confronting the defendant, the L5 S1 disc should have been surgically removed on October 13, 1959. Dr. Hawes testified that even if a presurgical diagonsis or rupture of the L5 S1 disc is made, nevertheless, "it is not unusual to remove a ruptured disc at L4 and L5 prior to looking at the other area," and went on to say that he could not give an opinion as to whether or not the doctor should have then looked at the other area unless he knew and took into consideration "the entity that was found at the time of surgery, the condi-

tion of the patient and other circumstances which have a great bearing." The witness was never asked to take those factors into consideration and then give an opinion. Obviously, without evidence that the defendant should have explored the L5 S1 area after finishing his work at L4 L5, there is no basis for a conclusion that he then should have performed surgery at L5 S1. I decline to agree to the Court's holding that there is evidence that the defendant should have performed surgery to remove the L5 S1 disc on October 13, 1959. The effect of the holding is to allow the jury to draw its own medical conclusions from the evidence, despite the fact that the only expert testimony is that no acceptable opinion can be expressed on the subject unless all of the circumstances of defendant's surgery are known and taken into consideration, and even though no expert witness ever expressed an opinion on the subject after taking the facts and circumstances of this particular case into consideration.

(3) There is no evidence that removal of or any kind of surgical procedure on the L5 S1 disc on October 13, 1959, would have corrected or prevented the problems of which plaintiff complains. Without evidence of that kind there is no way that a jury could reasonably conclude that the failure of defendant to explore or perform surgery at L5 S1 on October 13, 1959, in any way caused plaintiff's complaints. True, there is evidence that nerve involvement at L5 S1 could cause plaintiff's symptoms. But the evidence shows that it is equally possible that nerve involvement which in this case was shown to exist at L4 L5 could likewise cause the same symptoms. Under the record in this case, there are any number of possibilities which would explain plaintiff's symptoms. No one of them is shown by expert evidence to be a *probability*. Furthermore, even if it is assumed, *arguendo* that plaintiff's complaints were caused by L5 S1 involvement, standing alone, there is no expert evidence that removal of the L5 S1 disc on October 13, 1959, would have corrected the situation.

For all that appears from the record, the situation may well have been irreversible by October 13, 1959. In that case, failure of the defendant to remove the L5 S1 disc at that time could not possibly be the cause of plaintiff's complaints. Surely the Court does not intend to hold that there is evidence that it was not irreversible at that point in time. To so hold would be saying that expert evidence is not needed on that subject. Is it possible that the Court is holding that no evidence of any kind is needed?

There is no expert evidence that defendant, *under the particular circumstances confronting him,* should have taken further steps after October 13, 1959, and before June, 1960. There is some testimony in the abstract, and which was not given in answer to questions taking into consideration all of the relevant facts and circumstances confronting the defendant, that a doctor should have performed further evaluation with a myelogram and that "other care" should have been instituted and that *"possible* exploration" may have been in order. That testimony does not meet the test of "expert evidence *applied to the facts"* laid down by this Court; and, even if it did, it would be meaningless insofar as defendant's conduct is concerned, because: (a) the undisputed evidence is that another myelogram would not have revealed any information not already known to defendant and which would be diagnostic of a rupture of the L5 S1 disc, (b) defendant did take other steps, such as taking X-rays and sending plaintiff to other specialists, and there is no evidence of any "other care" not taken by the defendant which should have been taken, and (c) testimony that *"possible* exploration" may have been in order is hardly any evidence that a doctor, confronted with the particular facts and circumstances confronting defendant, should have in the exercise of care performed further surgery at the L5 S1 level. The mere fact that the witnesses said that re-evaluation by myelogram was indicated itself establishes without dispute that a number of things would

have to be taken into consideration and determined before deciding if further surgery should be performed; otherwise, why bother with a myelogram?

Assuming that further steps, such as myelogram and/or surgery should have been taken by the defendant after October 13, 1959, and before June, 1960, there is not the slightest expert evidence that any of the problems of which plaintiff complains *probably* would have been relieved or prevented by such further steps. As to the myelogram, the evidence affirmatively shows that a myelogram test would have revealed nothing new. As to further steps generally, including possible surgery at the L5 S1 level, there is no evidence as to a point in time when such steps should have been taken, nor is there any evidence as to a point in time when such further steps could have been taken in such a manner as to prevent the problems of which plaintiff complains.

Furthermore, there is no evidence that the defendant's failure to do something after October 13, 1959, caused the problems of which the plaintiff complains. As to this, I am afraid the Court's opinion will allow a jury, without benefit of expert evidence, to arbitrarily select a time or date when the defendant should have taken further steps, and to further decide, without expert evidence, that proper action by the defendant at the arbitrarily selected time would have corrected or prevented plaintiff's complaints.

The defendant's motion for instructed verdict was properly granted by the trial court. The evidence only raises a surmise or suspicion of the existence of facts sufficient to support a finding of negligence and proximate cause. The plaintiff's approach, approved by the Court, is contrary to the sound rule that:

> " * * * if an inference consistent with the existence of a fact in issue is but equally as valid as an inference of its nonexistence, then the jury may not determine the question. * * * There

must be evidence to support the conclusion that the inference of the particular fact is the more reasonable." Texas Pacific Fidelity & Surety Co. v. Hall, 101 S.W.2d 1050 (Tex.Civ.App.1937, err. dism.).

In Bowles v. Bourdon, 148 Tex. 1, 219 S.W.2d 779, 785, 13 A.L.R.2d 1, (1949), this Court said that it is not enough to show the injury, together with an expert opinion that an injury might have occurred from negligence and many other causes, because such evidence has no tendency to show that negligence did cause the injury. In Bowles, we went on to say that fact issues in a case such as this are raised only by proof of probability and not by proof of possibility. In so holding we quoted from an Iowa decision wherein it was said:

"Verdicts must rest upon reasonable certainty of proof. Where the proof discloses that a given result may have occurred by reason of more than one proximate cause, and the jury can do no more than guess or speculate as to which was, in fact, the efficient cause, the submission of such choice to the jury has been consistently condemned by this court and by other courts."

Two or more evidentiary factors suggesting a *possibility* that a fact exists will not suffice. The statements of facts, consisting of 446 pages, reflects, at most, a *possibility* that the defendant was negligent, and that negligence of the defendant was a proximate cause of the plaintiff's injuries and damages.

The trial court correctly granted the defendant's motion for instructed verdict. I make this assertion without fear of successful contradiction. The plaintiff has so far prevailed because he has convinced the Court that there is expert evidence in this case, and that defendant's argument is based upon inconsistencies in the testimony of some of the doctors rather than upon an absence of expert evidence. I interpret the defendant's position to be that none of the evidence when reasonably interpreted in context justifies a conclusion that material fact issues exist. Again, I say that the plaintiff's basic premise is unsound, and this basic premise has led the Court away from the essential factor necessary to convict the defendant of malpractice. The plaintiff's so-called expert witnesses have based their testimony on the premise of what is usually and customarily done, and not upon the facts of this particular case. The entire testimony of each witness must be considered and, if when all of it is taken into consideration, it is apparent that the witness is not saying that under the particular facts of the case, the operating doctor should have done certain things, the testimony of that witness is not expert evidence (applied to the facts) that he should have done those things. Therefore, the testimony of Drs. Hawes and Rehfeldt that exploration customarily or usually is conducted at L5 S1 following surgery at L4 L5, cannot possibly have any probative force where the expert evidence must be applied to the facts. This is especially true when such testimony is considered in the light of the doctors' further testimony that no intelligent opinion can be formulated as to what should have been done in any particular case unless a number of things are taken into consideration. These *things* were not taken into consideration by the doctors. There appears in this case nothing more than isolated questions and answers completely out of context. This record affords no basis or sound reason for invoking the well recognized rule that in deciding whether a directed verdict is proper, which is, the Court must accept the evidence most favorable to the plaintiff as true. The doctors' evidence relied upon by the plaintiff, clearly shows that they could formulate and state an intelligent opinion, because they were not requested to take into consideration the factors said by them to be essential to a meaningful answer so far as the issue involved was concerned.

The testimony upon which the plaintiff relies is not in answer to *proper* hypothetical questions relating to any significant

combination of facts. The attempt to convict the defendant of malpractice in performing surgery upon the plaintiff is based entirely upon testimony of a general and abstract nature. The following testimony is typical of the evidence relied upon by the plaintiff as evidence that the defendant should have explored the L5 S1 level following his surgery at L4 L5. It should be readily seen that such testimony does not meet the test. None of the controlling facts of the defendant's surgery are embraced within the questions, and, of course, such facts are not embraced in the answers. This is true in regard to all attempts by the plaintiff to establish negligence on the part of the defendant.

Dr. Hawes testified:

"Q. Doctor, do you have an opinion as to whether or not the doctor would be exercising the ordinary skill and care employed by others of the medical profession in the Dallas-Fort Worth area by scheduling a man for surgery at the L5–S1 level and then performing an operation on the L4–L5 level, without exploration of the L5–S1 level?

"A. I can only say this would depend on the entity that was found at the time of surgery, the condition of the patient and other circumstances which have a great bearing. I couldn't say absolutely.

"Q. I wasn't asking you to assume any other facts, Doctor. I want you to please assume the facts that you have been given. [which include none of the facts said by the doctor to be essential for him to form an intelligent opinion]. State whether or not you have an opinion as to whether or not a doctor, under these facts, would be exercising the ordinary care and skill employed by others of the medical profession in the Dallas-Fort Worth area by scheduling surgery at L5–S1, and then performing surgery at L4–L5, without any inspection or visualization of the L5–S1 disc?

"A. Yes, I have an opinion.

"Q. What is your opinion?

"A. It's customary to explore both L4–L5 and L5–S1."

Dr. Hawes made it clear that unless he took the facts of the defendant's surgery into consideration he could not arrive at and state an intelligent opinion. Dr. Hawes repeatedly made it clear that he was unable to formulate an intelligent opinion as to what should have been done by the *defendant* without *knowing* and *taking into consideration the facts of the defendant's surgery*.[1] Dr. Hawes could not formulate an intelligent opinion simply because he said that he had not been furnished with enough facts. The hypothetical questions propounded to him did not include facts relevant to the formation of an opinion.

1. At another point Dr. Hawes again made it clear that he was unable to formulate an intelligent opinion as to what should have been done by Dr. Van Zandt without knowing and taking into consideration the facts of Dr. Van Zandt's surgery, saying:
"Q. You mentioned that it is considered proper in your profession to look at the L4–L5 level and at the L5–S1. Assuming that you found a rather severely ruptured disc in the L4 and L5, and removed that disc to the best of your ability, then you deemed it to the patient's disadvantage to attempt further exploration in that operation, would you cease your work at the L4–L5 level?
"A. Yes."
and again:
"Q. Do you regard it in your practice that many times you are called upon with a judgment decision after you have started an operative procedure?
"A. Many times.
"Q. That's usual in most operations, is it not, Doctor?
"A. Yes.
"Q. Regardless of how clearly you outline your course of procedure prior to the operation, there are many times that you have to change that course of procedure during the actual operation, is there not?
"A. That is correct."

In Shuffield v. Taylor, 125 Tex. 601, 83 S.W.2d 955 (1935), this Court announced the rule in regard to the use of hypothetical questions:

"A hypothetical question should be so framed as to recite all the facts in evidence relevant to the formation of an opinion, and then, assuming the facts to be true, the witness should be asked, if able to form an opinion therefrom, to state such opinion.

"A question is not necessarily improper because it includes only a part of the facts in evidence, provided it embraces enough of them to enable the witness to formulate an intelligent opinion." See Topletz v. Thompson, 342 S.W.2d 151, (Tex.Civ.App.1960, no wr. hist.).

What I have said in regard to the testimony of Dr. Hawes is equally true of the testimony of Dr. Rehfeldt.[2]

Dr. Rehfeldt, it is seen, testified that his practice is to explore L5 S1 after performing surgery at L4 L5, but he also testified that "if we find a very good lesion at 4 and 5, we sometimes will not look at 5 and 1." Dr. Rehfeldt was never asked to take into consideration the type of lesion found by the defendant at L4 L5 and then state what, in his opinion the defendant should have done. Remember, this burden was upon the plaintiff. In fact the two doctors were never asked to take into consideration any of the other facts of the defendant's surgery. The doctors were never asked a question which embraced enough facts to enable them to formulate and state an intelligent opinion.

The plaintiff attempts to bolster his case by a comparatively lengthy argument that a jury would be entitled to disregard the testimony of the defendant that he found 90 per cent of the disc material extruded at L4 L5, as good lesion, because Dr. Van Zandt was a party defendant to the suit and an interested party. This is just some more of the mist created to help strengthen the untenable position of the plaintiff. I doubt that a jury would have been warranted in disregarding the defendant's clear and unimpeached testimony. Nor do I believe a jury would be properly performing its duty by disregarding the defendant's post operation report of October 13, 1959, that in making the operation at L4 L5, he found and removed "a large extruded disc * * * under the L-4-5 nerve root."

However, be that as it may, even if the statement were of a kind which could be disregarded by the trier of the facts, the plaintiff is right where he started, because once disregarded there is still no evidence of a vital factor which had to be taken into consideration by Doctors Hawes and Rehfeldt in arriving at an intelligent opinion as to whether or not the defendant should have explored L5 S1 after performing surgery at L4 L5. Do not forget that both Hawes and Rehfeldt testified that "it would depend on the entity that was found at the time of surgery." Surely, the jury would not be entitled to reject the testimony given by the defendant as to the type of *entity* found and

2. Further confirming that Dr. Rehfeldt was of the same mind as Dr. Hawes that the facts of each case must be considered before an intelligent opinion can be formed as to what should have been done is his further testimony, as S.F. 190:
"Q. Yes, sir. Now you testified that it was good practice, when exploring at the L4 and L5, to, also, explore the L5-S1?
"A. Yes.
"Q. Would that depend on the patient, the doctor's judgment and the length and duration of the operation, as to how far you would go in an operation?

"A. Yes, sir, depending upon what the surgeon's objective was.
"Q. If the surgeon felt in his mind that he had found the root of the trouble he was looking for, would he necessarily go further or would he stop when he thought he had covered the point that he was searching for?
"A. Usually a surgeon has an objective when he makes a procedure and when he feels he's reached that objective, he has reason to stop."

then substitute, without any support in the evidence, its own judgment as to the type of lesion which might have been found. Surely, a jury should not be allowed to compound the error by assuming that had the witness taken into consideration whatever type of entity the jury arbitrarily might have found, the witness then would have said that the defendant should have explored L5 S1. In Texas & P. Ry. Co. v. Brown, 142 Tex. 385, 181 S.W.2d 68 (1944), this Court said:

"We recognize the rule that a jury may accept or reject portions of the testimony of a witness, Austin Fire Ins. Co. v. Adams-Childers Co., Tex.Com.App., 246 S.W. 365; still, there must be other facts and circumstances, or the testimony of other witnesses in evidence, to supply that which has been rejected * * *."

Thus far my attention has been primarily directed to the question of whether the hypothetical testimony of plaintiff's witnesses constitutes evidence of negligence. I think that clearly it does not; but, assuming that such evidence does establish the fact that the defendant should have explored further, there is still no evidence, beyond a mere possibility, that had the defendant explored L5 S1 he would have found anything. Assuming one step further, that he did find a disc requiring surgical removal, there is no evidence that such removal would have prevented plaintiff's post-operative complaints. It is just as *possible* that the sacral nerves were injured in a number of ways: by involvement in the extension at L4 L5, or at L5 S1; by traumatic injury of some kind during the myelogram procedure; by surgical bruising; by scar tissue; or by a combination of such factors. There is no evidence, expert or otherwise, which shows a probability that the defendant's failure to explore L5 S1 or to remove a hypothetical injured disc at that level resulted in plaintiff's disabilities. I must conclude, from my examination of the record, that there is no evidence that defendant was negligent in his operative tech-

nique or procedure and there is no evidence that assuming negligence, it proximately caused plaintiff's complaints.

I would affirm the judgments of the Court of Civil Appeals and the trial court.