**John H. UPTON, Jr., a minor, by and through his mother and next friend, Bernice UPTON, Appellant,**

v.

**BAYLOR COLLEGE OF MEDICINE and Peter Kellaway, Ph.D., Appellees.**

**No. 01–89–00777–CV.**

Court of Appeals of Texas, Houston (1st Dist.).

April 11, 1991.

Rehearing Overruled June 13, 1991.

Robert Ballard, Grant Kaiser, Houston, for appellant.

Charles D. Boston, Doreen Z. Bartlett, Roger Townsend, & Madelyn DeWoody, Houston, for appellees.

Before DUGGAN, COHEN and PRICE*, JJ.

## OPINION

DUGGAN, Justice.

This is an appeal from an instructed verdict in a medical malpractice case. Appellant, John H. Upton, Jr., a minor, by and through his mother and next friend, Bernice Upton ("the Uptons"), brought suit against Dr. Robert Zeller, Dr. Mario Sertich, and the appellees, Peter Kellaway, Ph.D., an electrocorticographer, and Baylor College of Medicine, Dr. Kellaway's employer, for negligent medical treatment of the minor plaintiff in two surgical proceedings.

At the close of the Uptons' case, the trial court granted Dr. Kellaway's motion for an instructed verdict because there was no evidence that he breached the standard of care for an electrocorticographer, or that anything he did was a proximate cause of any problem with regard to the plaintiff/patient. The trial court also granted Baylor's motion for instructed verdict regarding its vicarious responsibility for Dr. Kellaway. The case went to verdict as to defendants Drs. Zeller and Sertich, and a take-nothing judgment was entered in their favor, which the Uptons do not appeal.

*Statement of Facts*

John H. Upton, Jr., suffers from epilepsia partialis continua ("EPC"), a rare and progressive form of epilepsy that causes constant seizures. In November 1978, John was admitted to Johns Hopkins Hospital, where he was evaluated by a team of physicians consisting of a neurosurgeon, Dr. Donlin Long, a pediatric neurologist, Dr. John Freeman, and an electroencephalographer, Dr. Ernst Niedermeyer. Because John's seizures could not be controlled by medication, and because of the progressive nature of EPC, the team concluded that surgery was necessary.

* The Honorable Frank C. Price, former Justice, Court of Appeals, First District of Texas at Houston, sitting by assignment.

On December 4, 1978, Dr. Long, with the assistance of Drs. Freeman and Niedermeyer, performed a craniotomy on John at Johns Hopkins Hospital in an effort to locate the portion of John's brain in which abnormal electrical activity was taking place. During the craniotomy, Dr. Niedermeyer performed electrocorticography (ECoG), the procedure that records electrical activity emanating from the brain. Unfortunately, the results obtained during this procedure did not definitively identify the cause and location of John's seizure activity. While the physicians believed the seizure activity was located in the motor cortex, they were not prepared at the time to excise a major portion of the brain because that would cause permanent paralysis. Instead, they opted to perform a thalamotomy,[1] a less extensive procedure, in an attempt to control John's seizures. Unfortunately, the thalamotomy did not cure the seizures.

At the time of John's discharge from Johns Hopkins on December 24, 1978, the physicians recommended, as the next step in his treatment, the more radical procedure of a right hemispherectomy.[2]

On February 11, 1979, John was admitted to Texas Children's Hospital under the care of Dr. Robert Zeller, a pediatric neurologist. On February 21, Dr. William Cheek, a neurosurgeon, performed a limited cortical resection, a right frontal lobectomy. Dr. Sertich was the assisting surgeon; appellee, Peter Kellaway, Ph.D., was the electrocorticographer during this procedure.

Although Dr. Cheek removed all the area from which abnormal electrical activity was issuing, John's seizures resumed after surgery, indicating that epileptogenic neurons still existed in John's brain. The resumption of these seizures led Dr. Cheek to schedule a second surgery on February 27, 1979, at which time he performed a hemispherectomy. Dr. Kellaway again performed the ECoG for the procedure. Following the hemispherectomy, John suffered from a staph infection in his brain. He is now incompetent and nonfunctional.

*Point of Error One*

In point of error one, the Uptons contend the trial court erred in granting Dr. Kellaway's motion for instructed verdict because "sufficient and compelling evidence established negligence and causation."

In reviewing the granting of an instructed verdict, this Court must determine whether there is any evidence of probative force to raise fact issues on the material questions presented. *Collora v. Navarro,* 574 S.W.2d 65, 68 (Tex.1978). This Court must consider all of the evidence in a light most favorable to the party against whom the verdict was instructed, disregarding all contrary evidence and inferences, and give the losing party the benefit of all reasonable inferences arising therefrom. *Id.* The reviewing court is not required, however, to consider one isolated answer by an expert witness where the absolute contrary clearly appears from the witness's other answers in the context. *Emanuel v. Bacon,* 615 S.W.2d 847, 848 (Tex.Civ.App.—Houston [1st Dist.] 1981, writ ref'd n.r.e.).

In a medical malpractice case, additional considerations come into play concerning this Court's review of the evidence in light of the instructed verdict. *Duff v. Yelin,* 751 S.W.2d 175, 176 (Tex.1988). To go to the jury, the plaintiff must bring forward competent testimony that the defendant was negligent, i.e., that the defendant breached the applicable standard of care, and that the defendant's negligence proximately caused the plaintiff's injury. *Duff,* 751 S.W.2d at 176; *Hart v. Van Zandt,* 399 S.W.2d 791, 792 (Tex.1965); *Bowles v. Bourdon,* 148 Tex. 1, 5, 219

---

1. The theory of the thalamotomy was to destroy the brain area that was causing the electrical activity, without removing an extensive amount of brain tissue.

2. A right hemispherectomy involves the substantial removal of the right side of the brain. This extensive and radical operation will cause permanent paralysis to the left side of the body. The procedure is undertaken only when it is believed the patient's continuous seizures can be controlled and anti-convulsive medications withdrawn.

S.W.2d 779, 782 (1949). On the proximate cause element, the plaintiff must establish a causal connection beyond the point of conjecture; proof of mere possibilities will not support the submission of an issue to the jury. *Duff*, 751 S.W.2d at 176.

### Standard of Care

 Dr. Ernst Niedermeyer, a neurologist specializing in electroencephalography (EEG) and epileptology at Johns Hopkins Hospital, testified that the electrocorticographer's role during the performance of neurosurgery is to read and communicate ECoG findings to the neurosurgeon. That is, the electrocorticographer tells the surgeon what is happening electrically in the explored part of the brain. During the surgery, the electrocorticographer tries to identify immediately any abnormality, especially epileptic abnormality, on the ECoG record. He looks only to the paper ECoG record, not to the brain, to identify these abnormalities.

During the preparation for and performance of the ECoG, the surgeon determines the arrangement or array of the electrodes, places the electrodes on the patient's brain, and determines the significance of any abnormal ECoG findings reported to him. The electrocorticographer does not engage in the actual surgery or tell the surgeon what brain tissue to remove. The surgeon (often after conferring with the anesthesiologist) decides whether to awaken the patient during neurosurgery, or to ask the awakened patient to respond to commands, or to employ electrical stimulation during corticography. No evidence showed that the electrocorticographer has any duty to recommend or perform any of these activities.

Appellant's witness, David Jensen, Ph.D., testified as to additional procedures described in medical literature that may be performed during ECoG, and that were not done by Dr. Kellaway on February 21. However, Dr. Jensen did not testify that the literature stated the standard of care applicable to Dr. Kellaway's performance of the ECoG on February 21. Further, Dr. Jensen acknowledged that he was not an expert in the field of epilepsy or EPC, or in either EEG or ECoG on humans; that he had no training or clinical experience in ECoG; and that he had never seen ECoG performed on a human being. Thus, while Dr. Niedermeyer's testimony established evidence of a standard of care for an electrocorticographer, Dr. Jensen's testimony did not.

### Negligence

The Uptons contend that Dr. Kellaway's "inadequate corticography led directly to an inadequate [February 21, 1979] surgery, which in turn led to the necessity for a quick second surgery, causing the infection." The Uptons set out the testimony of several witnesses in an attempt to establish that Dr. Kellaway's ECoG procedures and protocol were inadequate. They rely first on the testimony of Drs. Freeman and Long, the Johns Hopkins neurosurgeon and pediatric neurologist, respectively, who performed John's 1978 craniotomy and thalamotomy, to imply that the partial resection performed on February 21, 1979 was the wrong surgical procedure.

The Uptons erroneously assert that Dr. Freeman testified that he would not have done "the limited removal procedure performed as a result of Kellaway's inadequate assessment." A close review of Dr. Freeman's testimony shows that he did not testify that Kellaway performed an "inadequate assessment." [3] Instead, Dr. Free-

---

**3.** "QUESTION: Doctor, based upon your review of those records, did you arrive at an opinion as to the appropriateness of the treatment rendered by Dr. Cheek?

ANSWER: Yes.

QUESTION: And what was that opinion? What is that opinion?

ANSWER: My opinion is that while I might have done things differently than Dr. Cheek did, that I might not have done the initial surgical procedure of the right frontal lobectomy, that that was a matter of opinion. That I did not think that that would be effective in controlling John's seizures, and indeed ultimately I was proven right. However, I did not think that was an inappropriate thing to do. That the subsequent hemispherectomy which was done was appropriate and was what we had recommended, although it was done in a slightly different fashion than we

man testified that he might not have done the February 21st surgical procedure, the right frontal lobectomy, but he did not think it was an inappropriate thing to do. Neither Dr. Freeman nor any other witness criticized Dr. Kellaway's performance of the ECoG. Dr. Long's testimony also related to the appropriateness of Dr. Cheek's surgical decision to perform a frontal lobectomy on February 21, not to Kellaway's performance of the ECoG.

The Uptons imply that Dr. Kellaway was negligent in failing to discuss John's case with Dr. Niedermeyer, the Johns Hopkins electroencephalographer, and in failing to know that an ECoG was conducted on John at Johns Hopkins. However, Dr. Niedermeyer testified uncontrovertedly that there was no need for Dr. Kellaway to contact him or obtain his prior ECoG strips; that this information would have no value to the neurosurgeon because six weeks had gone by between the two hospitalizations; and that a neurosurgeon must rely upon the data generated intraoperatively to assess the patient's condition because patterns of abnormal electrical activity are highly variable and change over time. Furthermore, Dr. Niedermeyer testified that, in his opinion, Dr. Kellaway was not in any way negligent in performing the electrocorticography on John.

■ The Uptons further rely on the testimony of Dr. Long and David Jensen, Ph. D., to establish that the ECoG performed on February 21, 1979, during the first Houston surgery, was inadequate because: (1) the patient was not awakened during the surgery and asked to respond to commands; (2) the patient's brain was not electrically stimulated during the surgery; (3) the anti-convulsant medications were not withdrawn prior to surgery; and (4) antibiotics were not used peri-operatively. Testimony on these subjects dealt with medical decisions for which Kellaway, the Ph.D. electrocorticographer, was not responsible. The evidence is undisputed that (1) the neurosurgeon, a medical doctor, not a Ph.D. electrocorticographer, determines whether to withdraw the anti-convulsants prior to

might have done it here. It was not done in

surgery, and whether to awaken the patient or electrically stimulate the brain during surgery, and (2) the attending physician determines whether to use antibiotics prior to the surgery.

Dr. Jensen, appellant's Ph.D. witness, testified that it was his opinion that the ECoG procedure of February 21, 1979 was "inadequate." This was so, he testified, because "there are significant differences between what is described in the literature as what constitutes an ECoG procedure for this neurological surgery" and what the records and testimony showed was done here. He testified that the opinion he gave "was actually a distillation of what appears in the scientific literature."

However, Dr. Jensen testified that he did not have the training and experience to be qualified to perform clinical EEG, or to diagnose or utilize ECoG with human patients; that he had no clinical privileges anywhere; and that his only ECoG experience had been in experimental research with animals. He also agreed that to become an expert in the field of EEG and ECoG, "you have to have some clinical experience with patients to know how they respond and what kind of electrical discharges are produced and how to interpret those discharges." Further, he acknowledged that he did not consult with any electroencephalographer or clinical practitioner to review or find out what the clinical practice was on any of the issues pertaining to standards about which he gave an opinion. We hold that Dr. Jensen's expression of opinion that the ECoG proceeding was "inadequate" is "an isolated answer by an expert witness where the absolute contrary clearly appears from [the witness's] other answers in the context." *Emanuel v. Bacon*, 615 S.W.2d at 848. We hold that Dr. Jensen's testimony provided no evidence of Dr. Kellaway's negligence in the performance of ECoG on John.

*Causation*

■ The Uptons contend that because Dr. Kellaway failed to adequately perform the ECoG on February 21, 1979, it was

an inappropriate fashion."

necessary to perform the second Houston surgery, during which John contracted a staph infection. There was no evidence that Dr. Kellaway's performance of the ECoG proximately caused any injury to John. Furthermore, Drs. Freeman, Niedermeyer, and Long, the Johns Hopkins team, all testified it is not possible to say that, if a hemispherectomy had been performed on February 21, John's disabled condition would have been avoided. Dr. Freeman testified that if the hemispherectomy instead of the partial resection had been performed on February 21, John might still have contracted the staph infection because of the complexity and length of that procedure.

In summary, the Uptons have set forth no evidence establishing that Dr. Kellaway breached the standard of care in performing the ECoG on February 21, 1979, or made wrong ECoG readings that necessitated the next operation, or that any act or omission on his part proximately caused any injury to John Upton, Jr.

Point of error one is overruled

*Point of Error Two*

In point of error two, the Uptons contend the trial court erred in granting Baylor's motion for instructed verdict because it was premised on the erroneous granting of Dr. Kellaway's motion for instructed verdict.

The Upton's pleadings alleged, as the sole basis for Baylor's liability, that Baylor was vicariously responsible for Dr. Kellaway's acts and omissions. Because the Uptons presented no evidence that Dr. Kellaway was negligent or proximately caused injury to John Upton, Jr., the instructed verdict in favor of Dr. Kellaway was proper; therefore, the instructed verdict in favor of Baylor was also proper. See *Trevino v. Houston Orthopedic Center*, 782 S.W.2d 515, 517–18 (Tex.App.—Houston [14th Dist.] 1989, no writ) (summary judgment in favor of physician and hospital was reversed where physician failed to present evidence that negated his negligence, and summary judgment for hospital was predicated solely on physician's entitlement to summary judgment).

Point of error two is overruled.

*Point of Error Three*

In point of error three, the Uptons contend the trial court erred in excluding evidence relevant to bias. Specifically, they assert it was reversible error to exclude the answer to plaintiffs' interrogatory number 18, which inquired into an agreement between Kellaway and any other party. The Uptons state that this interrogatory answer was offered and denied on page 1377 of the statement of facts. However, the record contains neither the offer of the interrogatory into evidence nor the trial court's ruling on this alleged offer. It is the appellant's burden to set forth references to the pages of the record where the improper rejection of evidence may be found. TEX.R.APP.P. 74(f). The Uptons have failed to provide this Court with a sufficient page reference to show that the trial court erred in excluding the answer to interrogatory 18.

Point of error three is overruled.

The judgment is affirmed.